**OHIO POWER CO. v. N.L.R.B.**

No. 10779.

United States Court of Appeals
Sixth Circuit.

July 25, 1949.

John G. Ketterer, Canton, Ohio, Day, Cope, Ketterer, Raley & Wright, John G. Ketterer, R. M. Rybolt, Canton, Ohio, on the brief, for petitioner.

Mozart G. Ratner, Washington, D. C., David P. Findling, A. Norman Somers, Mozart G. Ratner, Melvin Pollack, Washington, D. C., on the brief, for respondent.

Before ALLEN, McALLISTER and MILLER, Circuit Judges.

ALLEN, Circuit Judge.

This case arises out of a petition to review an order of the National Labor Relations Board finding that petitioner had violated § 8(1) and § 8(5) of the National Labor Relations Act, and § 8(a) (1) and § 8(a) (5) of the Act as amended, 29 U.S. C.A. § 158(a) (1, 5), by refusing to bargain with a collective bargaining agent theretofore designated by the Board in a representation proceeding. The Board in its answer prayed for enforcement of the order.

The principal defense of the petitioner to the charges was that the bargaining unit was not appropriate in that it included the control operators, who, petitioner contends, are supervisors within the meaning of § 2(11) of the Act as amended, 29 U.S.C.A. § 152(11). Petitioner offered to bargain if its control operators should be excluded from the bargaining unit, but this offer was rejected by the union.

The controversy arises over proceedings with reference to the petitioner's Tidd Plant, situated on the Ohio River at Brilliant, Ohio. The Tidd Plant is a steam electric generating plant which generates electricity by the use of coal burned under boilers to produce steam, which is used to turn the horizontal turbine, which in turn is a driving force for the generators which produce the electric energy. At the time of hearing the plant had one unit of 100,-000 kilowatts per hour. The Tidd Plant is probably the most highly automatized electric generating plant in the industry. In plants of older design there are in general boiler rooms, turbine rooms, and pump rooms, with boiler operators, pump operators and turbine operators stationed near their respective equipment. At the Tidd Plant the controls for the boilers, turbines, pumps and other equipment are concentrated in one room, and the control operator handles the entire operation of the plant from this room where he spends 95% of his time. There are four control operators who relieve each other at this plant, one being on duty at every moment of the day.

The control operator is assisted by the assistant control operator and the auxiliary equipment operator. Fifty per cent of the time of the assistant control operator is spent in the control room assisting the control operator and receiving instructions in the control of the unit; and the other 50% of his time is spent in making trips to the pumps, turbines, or other locations in the plant, as directed by the control operator, or under established routine. The auxiliary equipment operator performs work formerly covered by several job classifications, such as part of the duties of the pump operator, of the condenser operator, of the ash man, of the soot blower, and of other employees. He operates the revolving screens, cares for the ashes, inspects fans on the tops of the boilers, and visits various parts of the plant periodically to look at the equipment, or at the direction of the control operator to inspect some specific thing in which the control operator may suspect that there is trouble. The control operator directs the activities of both the assistant control operator and the auxiliary equipment operator. As a usual thing he has nothing to do with the recommending of employment or discharge or discipline of the employees; but petitioner's superintendent stated that recommendations made by the control operator "would be given a great deal of weight." The only testimony concerning the nature of the work of the control operator was given by petitioner's superintendent, who was called as a witness on behalf of the Board. The superintendent answered questions on these matters as follows:

"Q. And it is necessary for him to make decisions on the spot? A. Particularly when there are emergencies, but in a routine way as to various adjustments.

"Q. But he has to do those things on his own initiative? A. He makes those decisions on his own initiative.

"Q. And the decisions which he makes are such as to control the operation of the entire unit? A. That is correct.

"Q. And thereby they control the entire output of the plant as it is now constituted? A. That is correct."

Petitioner contends in brief that under the uncontradicted testimony the control operators at the Tidd Plant are supervisory employees within the definition of § 2(11) of the National Labor Relations Act as amended by the Labor Management Relations Act of 1947, which reads as follows:

"The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with

the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

This section is to be interpreted in the disjunctive, National Labor Relations Board v. Edward G. Budd, Mfg. Co., 6 Cir., 169 F.2d 571, cert. denied 335 U.S. 908, 69 S.Ct. 411, and the possession of any one of the authorities listed in § 2(11) places the employee invested with this authority in the supervisory class.

It is not contended that the control operators have authority to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees or to adjust their grievances or effectively to recommend such action. The narrow question presented is whether under this record the control operators responsibly direct other employees, the exercise of their authority being not of a merely routine or clerical nature, but requiring the use of independent judgment.

The Board held that within the Act's definition the power responsibly to direct is sufficient to render an individual a supervisor, assumed that the control operator performs such duties and acknowledged that the literal construction of the statute made the activities in question supervisory. However, it concluded that the control operators do not perform supervisory functions within the Board's construction of the statute. The Board said that the legislative history indicates that the broad scope implied in a literal construction of the authority "responsibly to direct" was not intended by Congress, but rather that a specific qualified meaning was attached to this phrase, and therefore excluded control operators from the classification of supervisors as defined in § 2(11).

We think that the Board as a matter of law clearly erred in this decision. If resort were properly to be made to the statement made on the floor of the Senate by Senator Flanders of Vermont, who proposed the inclusion in the statute of the phrase "responsibly to direct" other employees, we find in his explanation no such limitation as the Board imposes. While it

does not appear that the control operators exercise the other specific powers set forth in the statute, they engage regularly, as Senator Flanders expressed it, in "the basic act of supervising." To be responsible is to be answerable for the discharge of a duty or obligation. Responsibility includes judgment, skill, ability, capacity, and integrity, and is implied by power. The control operators have no authority to hire or fire, but they do responsibly direct other employees. Each control operator is charged with the responsible direction of the generating unit and the men under him. With some minor exceptions he handles the entire operation of the plant. Hence, the control operators come squarely within the purview of Senator Flanders' explanation.

But we think this statute does not require resort to legislative history. Where the language of a statute is not free from doubt, resort may be had in its interpretation to reports of committees of Congress and to explanation of the bill on the floor of Congress by those who are in charge of or sponsoring the legislation. Wright v. Vinton Branch Bank, 300 U.S. 440, 463, 57 S.Ct. 556, 81 L.Ed. 736, 112 A.L.R. 1455. However, when the wording of an Act is plain and unambiguous, there is neither necessity nor justification for resort to legislative history to interpret its meaning. In such case the terms of the statute cannot be varied by resort to reports of congressional committees or the other familiar aids to statutory construction. Van Camp & Sons Co. v. American Can Co., 278 U.S. 245, 253, 49 S.Ct. 112, 73 L.Ed. 311, 60 A.L.R. 1060; Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann. Cas.1917B, 1168; United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 83, 53 S.Ct. 42, 77 L.Ed. 175; Goodyear Tire & Rubber Co. v. Federal Trade Commission, 6 Cir., 101 F.2d 620, 624, cert. denied, 308 U.S. 557, 60 S.Ct. 74, 84 L.Ed. 468; Michigan Window Cleaning Co. v. Martino, 6 Cir., 173 F.2d 466; Mesaba-Cliffs Mining Co. v. Commissioner, 6 Cir., 174 F.2d 857. The wording of § 2(11) is unambiguous, and no absurd or

futile results nor unreasonable effects "plainly at variance with the policy of the legislation as a whole" are produced by following the plain meaning of the Act. Cf. United States v. American Trucking Associations, Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345. It follows that it was error not to enforce the statute according to its terms.

■ The Board also erred as a matter of law in considering the test of the performance of supervisory duties to be the frequency of their exercise. It said in its amended decision: "Assuming, arguendo, that the control operator does perform 'supervisor' duties in major and minor emergencies, such as described hereinabove in the Respondent's offer of proof, this sporadic and infrequent exercise of authority is insufficient to invest him with the 'supervisory' cloak contemplated in the amended Act."

Section 2(11) covers any individual "having authority * * * responsibly to direct * * *." It does not require the exercise of the power described for all or any definite part of the employee's time. It is the existence of the power which determines the classification. That power responsibly to direct exists here is uncontradicted. The control operator at all times responsibly directs the assistant control operator and the auxiliary equipment operator. He has authority in time of emergency to requisition any men on the spot, in fact, to direct the activities of substantially all the employees at the Tidd Plant, and has on various occasions used this authority.[1] Several times during the winters of 1947 and 1948, when the coal which was used at the Tidd Plant was taken out of storage, it was found to be frozen. It clogged up in the bunkers, crushers, and to some extent on the belt conveyors and chutes carrying coal down to the pulverizers. The control operators requisitioned men to poke the coal down and keep it moving through the conveyors. Other types of emergencies have occurred in which the control operators have requisitioned men from the maintenance groups to keep the plant in operation. The fact that an emergency is not always in existence is immaterial, as also is the fact that the shift operating engineer is superior to the control operator. It is undisputed that in the absence of the shift operating engineer the responsibility rests upon the control operator to direct other employees in the handling of emergencies; that an emergency may require split second action, and that the control operator exercises this authority not as a matter of routine, but by the use of independent judgment.

The petition for enforcement is denied.

■ It is ordered, adjudged and decreed:

(1) That the Board's certification of representatives entered June 10, 1947 be vacated and set aside to the extent that control operators were included in such unit, and that such certification be amended by excluding control operators from such unit.

(2) That the decision of the Board that the petitioner was guilty of unfair labor practice in refusing to bargain with the representative of a unit which included control operators is vacated and set aside.

(3) That the Board's decision and order dated August 19, 1948, as amended by its amended decision dated December 17, 1948 and by its order amending amended decision, dated January 11, 1949, be vacated and set aside, and that the amended charge filed November 18, 1947 and the Board's complaint dated January 23, 1948, be, and they hereby are, dismissed.

---

[1] Much of the testimony with reference to the authority of the control operator was rejected by the intermediate examiner in the unfair labor practice proceedings. Proffer was made and the Board in considering whether this testimony should have been received at first sustained the intermediate examiner, and affirmed his rulings in a decision and order dated August 19, 1948. However, the Board later reconsidered its decision and order, accepted the petitioner's offer of proof rejected by the trial examiner, and in an amended decision dated December 17, 1948, proceeded to decide the case as though the testimony proffered had been received.