**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SOUTHERN AIRWAYS COMPANY, Respondent.**

No. 18333.

United States Court of Appeals
Fifth Circuit.
May 19, 1961.

sel, Stuart Rothman, Gen. Counsel, A. Brummel, Atty., National Labor Relations Board, Washington, D. C., for petitioner.

Frank A. Constangy, M. A. Prowell, Constangy & Prowell, Atlanta, Ga., for respondent.

Before JONES and BROWN, Circuit Judges, and CARSWELL, District Judge.

JOHN R. BROWN, Circuit Judge.

The Board seeks enforcement of its order finding Section 8(a) (3) and (1) violations by the Employer and ordering reinstatement with back pay of certain employees. The Employer's main argument here as before the Board is that the 8(a) (3) finding is erroneous since the employees concerned were supervisors within the meaning of § 2(11) of the Act[1] and therefore not within the protective language of § 8(a) (3), 29 U.S. C.A. §§ 152(11), 158(a) (3). The Employer also argues that the Board's previous ruling in a certification proceeding decided this issue making relitigation of the question in this proceeding improper.

The Employer operates an Army helicopter flight school at Camp Wolters, Texas. It also services and maintains the helicopters. This case involves only the maintenance department. Servicing of the helicopters is divided into three stages: (1) periodic inspection of the crafts; (2) pre-flight and post-flight checking and minor mechanical repairs; and (3) field maintenance work for maintenance and repairs requiring special or large equipment.

The employees involved here perform work within the first and second phases. Their major functions are to perform periodic inspections and to investigate and correct mechanical problems reported by pilots. Pre-flight checking is done

Rosanna A. Blake, Atty., NLRB, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Coun-

1. "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

on the flight line while post-flight and periodic inspection work is done in a hangar, but the work performed in each operation is very similar. The mechanics work in small crews varying in size from three to six men. Each pre-flight and post-flight crew is headed by a "flight chief" and each periodic inspection group by a "dock chief." The functions of the flight and dock chiefs are substantially the same. It is the supervisory status of the dock chiefs which is here in question and which is the primary issue raised by this proceeding.

Union organizational activity first began at the Employer's plant about February 1, 1958. On that day two employees, both dock chiefs, went to nearby Ft. Worth and returned with a number of union authorization cards, some of which were handed out to employees. A few days later several of the dock chiefs held a meeting after working hours and planned a union organizational meeting the following Saturday night. The next day dock chiefs Hennessee and Bradshaw, pursuant to the course of action decided on the night before, arranged for a meeting place prior to reporting for work at their regular afternoon times. Shortly after beginning work the same day Hennessee was told to report to the office of the Director of Aircraft Maintenance. On doing so the Director, Schwalm, informed him that he was fired for "doing other activities while on the job." Later the same day Bradshaw was called into Schwalm's office and discharged, the only reason given being "excessive absenteeism." Schwalm, however, denied Bradshaw's request to see his leave slips. At this same time a mechanic, Sword, was suspended "pending investigation into solicitation." He was later reinstated with back pay.

The Union meeting was held as scheduled Saturday night with several dock chiefs, including Coffee, Brooks, Wilson and Thompson attending. On the following Monday Director Horton, Schwalm's superior, called meetings of the flight and dock chiefs. He told them that as supervisors they should state, if asked, that the company was opposed to the Union. He made other remarks about the lengths the company would go to in fighting the Union and stated they had "already gotten rid of the ring leaders." In addition he asked what persons present had attended the Union organizational meeting. When dock chiefs Coffee, Brooks, and Wilson admitted attending, they were told that no action would be taken against them but they would be fired if they undertook any further Union activity.

The following Thursday hangar chief Tuck, the supervisor directly in charge of the dock chiefs, held a meeting of the afternoon shift employees. At the meeting he spoke out against the Union. He asked for comment from the floor and Brooks and Coffee both made statements complaining about certain company wage practices. Shortly after the meeting the four dock chiefs who had attended the Union meeting were escorted to Schwalm's office where they were interviewed individually. The result of these interviews was that Coffee, Brooks and Wilson were discharged for "insubordination" for refusing to side with the company on the Union issue. Apparently "siding with the company" included a requirement to speak out against the Union on occasion. The fourth dock chief, Thompson, was retained when he agreed not to express any thoughts contrary to the company's position regardless of what he personally felt.

The Board found that the dock chiefs were not supervisors and therefore the discharges being based at least in part on refusal to abandon Union activity constituted violations of §§ 8(a) (3) and (1) of the Act.[2] It found further that the anti-Union remarks made by Horton and others admittedly supervisors at the

2. As dock chief Coffee did not desire reinstatement, the Board ordered only that he be awarded back pay up to the time he made this intention known. Dock chief Bradshaw was denied any relief because of material misrepresentations concerning criminal convictions made in his application.

various meetings discussed constituted violations of § 8(a) (1).[3] As the record here amply supports the Board's findings of violations of the Act if the individuals in question come within its protection, it is only this latter issue which we must consider.

The first contention pressed by the Employer is that the question of the dock chiefs' supervisory status has already been decided by the Board favorably to it in an earlier certification proceeding. In it the Board found that both the flight and dock chiefs were supervisors.[4] Therefore, it asserts, the earlier decision is binding on the Board on principles akin to res judicata and it could not properly make a contrary finding in the present complaint case.

While on its face there appears to be some merit to this position, closer examination shows that it cannot be sustained. It is, of course, true that the cases have many times upheld a conclusion by the Board that it would not redetermine an issue previously decided in a certification proceeding. Pittsburgh Plate Glass Co. v. N. L. R. B., 1941, 313 U.S. 146, 161, 61 S.Ct. 908, 85 L.Ed. 1251; N. L. R. B. v. Southern Bleachery & Print Works, Inc., 4 Cir., 1958, 257 F.2d 235, 241; N. L. R. B. v. American Steel Buck Corp., 2 Cir., 1955, 227 F.2d 927, 929; Phillips Petroleum Co. v. N. L. R. B., 5 Cir., 1953, 206 F.2d 26, 30; N. L. R. B. v. Worcester Woolen Mills Corp., 1 Cir., 1948, 170 F.2d 13, 16; N. L. R. B. v. West Kentucky Coal Co., 6 Cir., 1945, 152 F.2d 198, 200–201. But these cases do not compel us to find that the Board's action was improper under the present circumstances. They hold only that when the Board has certified a unit and there follows a complaint for refusal to comply with this certification, the Board has considerable discretion in determining whether to reopen an issue decided in the earlier proceeding.[5] Under the circumstances of this record the decision of the Board in its formal order affirming the Trial Examiner's finding that the flight and dock chiefs were not supervisors was one which was within its discretion to make notwithstanding the intervening certification. Of course, as before stated, the substantive validity of the final conclusion is still open, and indeed is the principal subject of this proceeding.

The incidents made the basis of this unfair labor practice complaint occurred in February of 1958. The Trial Examiner's hearing was held in June and July of the same year, but the intermediate report on this hearing was not issued until several months later. In the meantime, a certification hearing was held in September followed shortly by the Board's Certification Order in that case. It was not until two weeks after that Certification Order that the Examiner's Intermediate Report on the complaint hearing now before us was issued. And the Board Order affirming the Trial Examiner in the present case did not issue until some ten months after its order in the certification proceedings.

Thus we have two decisions based on the facts as they existed at two different

3. The Employer does not contest this § 8(a) (1) violation finding. It further has complied with so much of the order as requires reinstatement of dock chief Hennessee.

4. Southern Airways Co., case No. 16–RC–2276 (not reported in the printed volumes). This decision was issued two weeks prior to the Intermediate report in the present case. The unfair labor practices we are concerned with occurred prior to the Board's decision in the certification proceeding. Hence there was no detrimental reliance by the Employer on the earlier decision.

5. This, of course, has no bearing on the ultimate review of the validity of a certification order through the medium of a complaint case. Indeed, a complaint is the usual manner in which to have the validity of a prior certification tested by the Board or by the Court of Appeals. N. L. R. B. v. Dan River Mills, 5 Cir., 1960, 274 F.2d 381, 388; Cone Bros. Contracting Co. v. N. L. R. B., 5 Cir., 1956, 235 F.2d 37, 41; Pittsburgh Plate Glass Co. v. N. L. R. B., 1941, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251.

times, several months apart. The intervening certification order is not, therefore, controlling although, to the extent it represents an analysis of similar facts, it may have some persuasive relevance.

■ The Employer next contends strenuously that assuming the Board's power to redetermine this question, its conclusion that dock chiefs were not supervisors is completely contrary to the facts adduced before the Examiner. The finding, he asserts, is likewise contrary to the decisions interpreting § 2(11).

The question is, of course, one of degree. A company president is clearly a supervisor while it is equally certain that a mere straw boss is not. Where between the two extremes is the line separating supervisory and non-supervisory employees to be drawn?

■ The legislative history of § 2(11) is helpful in this regard. The Senate Report envisaged a "supervisor" under the Act as being an employee "vested with such general management prerogatives as the right to hire or fire, discipline, or make effective recommendations with respect to such action. * * *" Sen.Rep. 105, 80th Cong.; 1 Leg.His. of the L.M.R.A. p. 410; Poultry Enterprises, Inc. v. N. L. R. B., 5 Cir., 1954, 216 F.2d 798, 801. As expressed on the floor of the Senate, to come within this category the individual should "direct responsibly" the action of employees under him. 2 Leg.His. of the L.M.R.A., p. 1303; N. L. R. B. v. Swift & Co., 9 Cir., 1957, 240 F.2d 65, 66 note 1. The Conference Report on the Bill later enacted into § 2(11) shows that the definition was intended to cover persons "generally regarded as foremen and persons of like or higher rank." 1947 U.S.Code Cong. & Admin.News, pp. 1135, 1141.

The cases interpreting this section of the Act help greatly in delineating who are supervisory employees. They have pointed out that the mere responsibility of making work assignments in a routine fashion does not make an employee a supervisor. Precision Fabricators, Inc. v. N. L. R. B., 2 Cir., 1953, 204 F.2d 567;

nor does the mere fact that he must spend a portion of his time instructing less experienced employees. N. L. R. B. v. Valentine Sugars, Inc., 5 Cir., 1954, 211 F.2d 317. And, of course, the assumption of some supervisory authority for a temporary period or a short time each day does not bring one within the definition. N. L. R. B. v. Steward, 5 Cir., 1953, 207 F.2d 8; Poultry Enterprises, Inc. v. N. L. R. B., 5 Cir., 1954, 216 F.2d 798. But those are not the facts now before us. The duties of the dock chiefs went further. They were charged with some serious responsibilities in directing and supervising the men in their crews respecting both mechanical and personnel matters.

N. L. R. B. v. Edward G. Budd Mfg. Co., 6 Cir., 1948, 169 F.2d 571, 575, is more nearly in point. In that case the employees in question were in charge of production within their respective departments. Except for minor departures in minor matters or emergencies, the work done was controlled by production schedules. As in the instant case, any recommendations they made as to discharging persons in their departments had to be passed on by higher officials. Nevertheless, in their own departments, "they [did] exercise a good deal of discretion in carrying out their orders." These circumstances were found sufficient to bring the employees within the statutory definition of supervisor.

■ The evidence adduced before the Trial Examiner brings the dock and flight chiefs within these standards. It is evident in many ways from these facts that the Employer did not look upon these persons as mere employees having slightly higher technical skills. Rather it regarded them as significant members of its supervisory staff. They were paid from $25 to $65 a month higher than the senior mechanics, the highest mechanic classification. Their salary was equal to that of foremen in the other smaller departments.

While they performed some manual activities along with the mechanics, they had other functions. They handled significant paper work concerning the main-

tenance tasks performed by their crews. It is uncontradicted that they exercised considerable judgment in the manner in which work was performed. They assigned work to the mechanics under them and inspected that work on completion. Both the flight and dock chiefs had to decide what work should be referred to field maintenance rather than performed by their respective crews. While a great deal of their work was done from Army check lists, they were required to check for other defects and either repair these or report them to the hangar or line chiefs. Thus in a very real sense the quality of the work done by the Employer depended on the judgment of these chiefs. In relation to its customers the performance of its contract by the Employer, and its business reputation, rested to a great extent on the correctness of decisions made by these persons.

But of more significance was their responsibility in personnel matters. This is so even though it is undisputed that a dock chief could not discharge or transfer an employee in his crew on his own authority. This factor nevertheless assumed vital importance under the "effectively to recommend such action" language of the Act, see note 1, supra. Ohio Power Co. v. N. L. R. B., 6 Cir., 1949, 176 F.2d 385, 11 A.L.R.2d 243, certiorari denied 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553. The Board does not question the fact, as brought out in the testimony of several witnesses, that there were occasions on which a dock chief recommended that a certain individual in his crew be discharged or transferred and pursuant thereto the recommended action was taken by the hangar chief or Director Schwalm. It argues, though, that no action is ever taken on these recommendations until a complete independent investigation has been conducted, and that in the instances cited the result was produced by the nature of the information received, not its source. We disagree.

The uncontradicted facts show several things. First, the recommendations were at least effective a good portion of the time. Indeed, in some cases the chiefs' recommendations were approved without further inquiry. Investigations were usually made only when a complaint was received concerning the proposed action. And even in the case of a disapproved recommendation of discharge, the employee in question would occasionally be transferred to another crew. Therefore, the chiefs did have effective responsibility in making recommendations to determine which men would work under them in their crews. In addition, the facts show that the Employer depended on these individuals as a link in the supervisory chain of command. The very fact that the Employer considered that these recommendations justified the time and expense of an investigation reflects the substantial significance attached to them.

The position of flight and dock chiefs in the company hierarchy is indicated further by the fact that the Employer consistently treated them as supervisors in many other pertinent respects. Meetings of these chiefs and higher supervisory personnel were held regularly at which various matters pertaining to the functioning of the shops were discussed. In the normal course of operation the chiefs would pass relevant information on to their mechanics. It, of course, begs the question to discuss the Employer's activity with regard to the Union as it affected these individuals. Consequently our decision cannot be rested on it. Nevertheless it is a circumstance that in union problems they were consistently treated as supervisors. They were openly told that they could not take part in Union activity, nor could they advocate the Union, under penalty of discharge. On the contrary, they were to voice the company's policy against the Union. There is no indication that other employees were so treated. The discrimination shown by the Employer in the selection of those with whom it would discuss these anti-union problems shows that management regarded them in quite a different status from other workers. The result of our decision is to say retroactively that in so regarding them the Employer was legally justified.

We think that all the evidence taken together requires a finding that the flight and dock chiefs were supervisors under § 2(11). Therefore enforcement of the § 8(a) (3) and (1) violations pertaining to them will be denied.

Enforced in part and denied in part.