**FEDERAL COMPRESS & WAREHOUSE COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 18061.

United States Court of Appeals
Sixth Circuit.

Aug. 8, 1968.

Edward R. Young, Memphis, Tenn. (Newell N. Fowler, Fowler, Brackhahn & Young, Memphis, Tenn., on the brief), for petitioner; Leslie A. Nicholson, Nicholson & Moore, Memphis, Tenn., of counsel.

Joseph A. Yablonski, National Labor Relations Board, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Gary Green, Atty., National Labor Relations Board, Washington, D. C., on the brief), for respondent.

Before PHILLIPS, PECK and COMBS, Circuit Judges.

PHILLIPS, Circuit Judge.

Federal Compress and Warehouse Company petitions to review and set aside a decision and order of the National Labor Relations Board, reported at 166 N.L.R.B. No. 17, in which the Board found that the employer had violated Sections 8(a) (1) and 8(a) (5) of the National Labor Relations Act. The Board cross-petitions for enforcement of its decision and order.

Federal Compress contends that there are two reasons why it should not be required to bargain with respect to the classifications of shed clerk and maintenance repairmen: (1) both of these classifications are supervisory within the meaning of the National Labor Relations Act, 29 U.S.C. § 152(11); and (2) assuming that these classifications are not supervisory, the union contractually waived its right to bargain until the expiration of the existing collective bargaining agreement.

Since April 26, 1943, Retail, Wholesale and Department Store Union, AFL-CIO, Local 19, has been the bargaining representative of all Federal Compress production and maintenance employees. Supervisory and clerical personnel were not included in the bargaining unit. During the period under consideration the Union and the company had entered into a collective bargaining agreement.

On August 25, 1965, the Union filed a clarification petition with the Regional Director, requesting that the unit be clarified to include shed clerks and maintenance repairmen. In the clarification proceeding the employer contended that the shed clerks and maintenance repairmen were supervisors. The Regional Director held to the contrary and included these classifications in the bargaining unit. The Board denied the request by Federal Compress for review and later refused the request to reconsider.

Following the clarification proceeding, the Union requested that the company provide certain information to facilitate collective bargaining with respect to the shed clerks and maintenance repairmen. The company responded that the persons formerly holding these classifications had been promoted to foreman positions. Thereupon, the Union filed a charge with the Regional Director alleging that the company refused to bargain about the wages, hours and working conditions of shed clerks and maintenance repairmen. Later Federal Compress and the Union entered a settlement agreement in

which the company agreed not to change any of the terms or conditions of employment of the two classifications without prior notice and opportunity to negotiate with the Union. Nevertheless, in later bargaining the company insisted that because the individuals holding these positions had been made supervisors, it was only obligated to bargain with respect to future employees in the classification of shed clerk and maintenance repairmen. Federal Compress was willing to bargain on the issue of whether the "promoted" employees were included in the bargaining unit but refused to bargain with respect to their terms and conditions of employment.

Based on this refusal to bargain the Regional Director set aside the settlement agreement and filed unfair labor practice charges against the company. The Board adopted the findings and conclusions of the trial examiner which were summarized as follows:

"In sum, as there are absent any overriding considerations, I conclude, and find, that Respondent has, since April 7, 1966, violated Section 8(a) (5) and (1) of the Act (1) by unilaterally granting wage increases to employees in the contract unit on April 7, 1966, and on September 1, 1966, in derogating of the Union, the exclusive bargaining agent of these employees; (2) by refusing to negotiate with the Union concerning the classifications of shed clerk and maintenance-repairman in the unit, except during the open period of the contract; and (3) during such negotiations as were held with the Union in August and September 1966, by conditioning wage increases for other classifications of employees (who were in the unit at the time the classifications of shed clerk and maintenance-repairman were added thereto by Board decision) upon the exclusion of incumbent shed clerks and maintenance-repairmen from the unit, and by offering to bargain only as to future employees in these two classifications."

Federal Compress is engaged primarily in the business of storing and compressing cotton. Shed clerks check bales of cotton as they are loaded or unloaded at the warehouse. The cotton is moved by employees known as clipper drivers who use vehicles similar to fork lifts. Federal Compress contends that the shed clerks supervise the clipper drivers and that the maintenance repairmen supervise their individual helpers.

Two issues are before this Court:

(1) Whether substantial evidence supports the decision of the Board that nine alleged supervisors are not supervisors within the meaning of the Act; and (2) whether by entering into a collective bargaining agreement which did not expressly include the alleged supervisors, the Union waived the right to bargain with the employer as representative of these individuals.

We hold (1) that substantial evidence on the record as a whole supports the finding of the Board with respect to seven of the nine alleged supervisors; and (2) that under the terms of the collective bargaining agreement here involved the Union did not waive the right to bargain as representative of these individuals.

### 1) The Issue as to the Supervisors

In the unit clarification proceeding it was established that when cotton is being unloaded, a shed clerk checks the bales for the accuracy of the tag number. In a loading situation, the shed clerks get their shipping orders from the shipping foreman. Shed clerks check the numbers on the bales of cotton against the shipping orders and tell the clipper drivers to move the bales. Instructions to the drivers include telling them how the car is to be loaded. Clipper drivers are assigned by the general foreman to a gang for the purpose of loading or unloading cotton. The shed clerks do not have clipper drivers permanently assigned to them. The unit clarification decision described the work duties of the two maintenance repairmen

as maintaining and repairing the approximately sixty buildings which make up the Federal Compress warehouse operation. It was stated that each has at least one man, classified as a repairman, who is regularly assigned to work with him. The record in the present case, however, shows that substantially heavier duties of supervisory character have been delegated to the two maintenance repairmen than described in the unit clarification decision.

Although Federal Compress does not concede the correctness of the unit clarification which found that shed clerks and maintenance repairmen were non-supervisory employees, the company relies heavily on additional duties and powers which were subsequently given to these individuals. It is contended that the employer decided to enlarge the supervisory authority of certain individuals in these classifications so as to make certain that they would be supervisors under the Act. They were told that they had authority to hire and fire, to suspend employees, to grant overtime, to grant leave, and to perform other functions of management. They were instructed to keep records of the exercise of this authority and to report their actions to the office. The Board and the trial examiner agreed that the obligation of Federal Compress "to bargain as to these individuals, who were found not to be supervisory in the unit clarification decision might, under some circumstances, be altered by developments subsequent thereto" but held that none of the nine alleged supervisors are in fact supervisors within the meaning of the Act.

Thus we reach the question of whether the individuals formerly known as shed clerks and maintenance repairmen are supervisors within the meaning of the National Labor Relations Act:

"The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11).

Because the criteria of supervisory status are set forth in the disjunctive, an employee who performs any one of these functions meets the statutory definition of supervisor. N. L. R. B. v. Roselon Southern Inc., 382 F.2d 245 (6th Cir.); Eastern Greyhound Lines v. N. L. R. B., 337 F.2d 84 (6th Cir.); Ohio Power Co. v. N. L. R. B., 176 F.2d 385 (6th Cir.). It is not necessary that the employee be required regularly and routinely to exercise the powers set forth in the statute. It is the existence of the power which determines whether an employee is a supervisor. Ohio Power Co. v. N. L. R. B., 176 F.2d 385 (6th Cir.), cert. denied, 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553. The power must actually exist. Authorization on paper for the purpose of excluding an eligible employee from a bargaining unit, with no intent that the power ever actually be exercised, is not sufficient.

Whether an employee is a supervisor is a question of fact, and the Board's decision is conclusive if supported by substantial evidence. Peoples Service Drug Stores, Inc. v. N. L. R. B., 375 F.2d 551 (6th Cir.).

Federal Compress attempted to establish that the shed clerks had authority to fire clipper drivers. The record is replete with evidence that shed clerks were told of their power to fire and that they were to make a record of any discharges. Specifically, Federal Compress sought to prove that shed clerk Frank Searcey fired clipper driver Lacey Aldridge. The Board found that although the shed clerks may have been the conduit through which the discharges were effected, shed clerks did not exercise the independent judgment

which the statute requires of a supervisor.

The testimony of Leroy Boyd is to the effect that general foreman Oldham signed and gave shed clerk Searcey the card by which Searcey notified Aldridge of his discharge. Although this version of Aldridge's discharge is controverted, the testimony of Boyd, who observed the entire episode, constitutes substantial evidence from which the Board could conclude that Searcey exercised no independent judgment in firing Aldridge. Federal Compress also introduced certain cards which purported to be records of other firings by shed clerks. One card showed that shed clerk Turk had fired a clipper driver, but on the witness stand Turk denied having fired anyone. Viewing the record as a whole, the Board well could conclude that the shed clerks' power to fire was more apparent than real.

A former shed clerk who was "promoted" to loading foreman testified that shortly after the unit clarification proceeding he had hired an employee. The accuracy of this alleged hiring by a shed clerk was contradicted at the clarification hearing by the testimony of a Federal Compress officer. Evidence of the circumstances of the alleged hirings is, to say the least, scant and inconclusive. The record also warrants the finding that the shed clerks' direction of the clipper drivers was limited to telling them which bales to get according to an IBM list which was furnished by general foremen. This type of direction was routine and lacking in the exercise of independent judgment.

The employer contends that the shed clerks who now perform the additional duty of licensed weigher have attained supervisory status. The function of a weigher is to determine the number of pounds a bale of cotton weighs and to issue a government bonded receipt which makes Federal Compress responsible for the stated number of pounds. The Board properly determined that weighing is more in the nature of an additional work duty which does not involve the exercise of any of the statutory functions of a supervisor.

Solely on the basis of testimony that the duties of maintenance repairmen were the same as they were at the time of the unit clarification proceeding, the Board found that the two maintenance repairmen, Aderholt and Harder, were not supervisors. This conclusion ignores uncontroverted testimony that maintenance repairman Aderholt has hired crew members at the company's gate; that Aderholt has fired one or two employees; that Harder has the same powers but has never used them; that Aderholt purchases most of the construction maintenance supplies; that on occasions a maintenance repairman supervises a crew of up to twenty members; and that neither Aderholt nor Harder engages in manual labor. The Board's finding that the position of these two maintenance repairmen is non-supervisory cannot be reconciled with this undisputed evidence which demonstrates both the existence and the exercise of supervisory functions.

When maintenance work is slack, Aderholt and Harder also work as shed clerks and manage the movement of freight. While working as shed clerks and in managing freight they may lack the powers of a supervisor. When performing their customary duties as maintenance repairmen, however, the evidence requires the conclusion that Aderholt and Harder are supervisors within the meaning of the statute.

■ We therefore hold that substantial evidence supports the findings of the Board that the shed clerks are not supervisors but fails to support the Board's findings as to Aderholt and Harder.

### 2) The Issue of Waiver

In the alternative, the employer contends that although the Union may have been entitled under the statute to bargain with respect to the classifications of shed clerk and maintenance repairman, the Union waived this right by the

execution of the collective bargaining agreement.

Despite the assertion that the Union had attempted to negotiate the inclusion of these classifications in the collective bargaining unit, the classifications of shed clerk and maintenance repairman were not specifically covered under the terms of the executed contract.[1] According to the employer, its insistence upon the omission of these two classifications as the basis of contractual waiver is strengthened by the so-called zip-up clause, found in article XVII of the contract.[2]

The Board urges that the question of waiver is controlled by Dura Corp. v. N. L. R. B., 380 F.2d 970 (6th Cir.). In *Dura* the employer's profit sharing plan was restricted to salaried employees who were not members of a collective bargaining unit. The Union sought to include its members in the profit sharing plan. The employer refused to alter its plan. The Union thereupon filed an unfair labor practice charge against Dura because of its refusal to amend the profit sharing plan to provide for the eligibility of members of collective bargaining units. After the unfair labor practice charge was filed, the Union and the employer entered a collective bargaining agreement which did not provide for profit sharing. The collective bargaining agreement in *Dura* included the following recitation:

"* * * [T]he Company and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter not specifically referred to or covered in this Agreement * * *."

The above recitation of waiver of bargaining with respect to "any subject or matter not specifically referred to" is far more positive than the recitation in the Federal Compress agreement to the effect that it shall be "the sole and entire agreement between the parties" and shall remain in force unless "modified in writing by the mutual agreement of the parties."

Nevertheless, the language used in the Dura agreement was not found to be controlling of the issue of the waiver of collective bargaining rights. In *Dura* the fact that prior to the execution of the contract the Union had filed unfair labor practice charges concerning the profit sharing plan raised substantial doubt as to the appropriate interpretation of the waiver language. Thus the lack of clarity in the Dura agreement was due in large part to the pending unfair labor practice charges, a circumstance outside of the language of the contract.

In order to effectuate the relinquishment of a collective bargaining right under the provisions of a collective bargaining agreement, the language must be clear and unmistakable. "Silence in the bargaining agreement on such an issue does not meet this test." Timken Roller Bearing Co. v. N. L. R. B., 325 F.2d 746, 751 (6th Cir.).

---

1. "This Agreement covers all maintenance and production employees, except those temporarily so employed (which shall be construed to mean an employee who has had less than thirty (30) days continuous service) in the Employer's South Memphis Plant, excluding all other employees at said plant such as supervisory, office, clerical employees, and engineers, watchmen and employees doing police duty."

2. "XVII.
"Duration:
"(a) This Agreement constitutes the sole and entire Agreement between the parties hereto as of the date hereof, and shall become effective and remain in force for the term hereof, as provided in paragraph (b) of this section, unless earlier changed or modified, in writing, by the mutual agreement of the parties hereto. During the term of this Agreement, no change or modification shall be binding upon either of the parties hereto, unless the same shall have been reduced to writing and signed by both parties hereto."

While the zip-up clause, Article XVII, appears to bar midterm negotiations on matters covered by the agreement, a fair reading on the contract language [3] compels the conclusion that the contract does not purport to embody any agreement with respect to the shed clerks and maintenance repairmen. The failure expressly to include shed clerks and repairmen is subject to conflicting inferences. It is no more logical to infer that the Union waived its right to bargain with respect to these classifications than to conclude that bargaining on this controversial issue was deferred. The employer has failed to establish a contractual waiver by clear and unmistakable language.

The petition to set aside the order of the Board is overruled. Enforcement of the decision of the Board as to Aderholt and Harder is denied because they are supervisors within the meaning of the Act. In all other respects enforcement is granted.