USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1006 NORTHEAST UTILITIES SERVICE CORPORATION, Petitioner, v. NATIONAL LABOR RELATIONS BOARD, Respondent. ____________________ INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 455, AFL-CIO-CLC, Intervenor ____________________ ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD ____________________ Before Selya and Cyr, Circuit Judges, ______________ and Zobel,* District Judge. ______________ _____________________ Gregory B. Nokes, with whom Kevin D. O'Leary, William H. _________________ ________________ __________ Narwold, and Cummings & Lockwood were on brief for petitioner. _______ ___________________ Margaret Gaines Neigus, Supervisory Attorney, National Labor ______________________ Relations Board, with whom Frederick L. Feinstein, General ________________________ Counsel, Linda Sher, Acting Associate General Counsel, Aileen A. __________ _________ Armstrong, Deputy Associate General Counsel, Peter D. Winkler, _________ _________________ Rosemary Pye, National Labor Relations Board, Marshall T. _____________ _____________ Moriarty, and Maskele and Moriarty were on brief for respondent. ________ ____________________ ____________________ September 20, 1994 ____________________ ____________________ * Of the District of Massachusetts, sitting by designation. ZOBEL, District Judge. Northeast Utilities Service ZOBEL, District Judge. _______________ Corporation (the "Company") petitions for review of a final order of the National Labor Relations Board (the "Board"). The Board cross-applies for enforcement of that order,1 pursuant to sections 10(e) and (f) of the National Labor Relations Act (the "Act"), 29 U.S.C.A. 160(e),(f)(West 1973). The only issue before this Court is whether the Board had substantial record evidence to conclude that certain of the Company's employees, known as Pool Coordinators ("PCs") and Senior Pool Coordinators ("SPCs"), are neither "supervisors" within section 2(11) of the Act nor managerial employees and therefore may constitute a collective bargaining unit. I. International Brotherhood of Electrical Workers, Local 455 (the "IBEW"), filed a petition with the Board seeking to be certified as exclusive collective bargaining representative of the PCs and SPCs. The Company opposed the petition on the ground that these employees were exempt from the Act because of their supervisory and managerial status. Based on evidence presented at preelection hearings, the regional director found that neither PCs nor SPCs were supervisors or managers. Accordingly, she directed an election. The Company filed a timely "Request for Review" which the Board rejected as raising no substantial issues warranting reconsideration. ____________________ 1 The Board's November 24, 1993, Decision and Order is reported at 313 N.L.R.B. No. 65 (Nov. 24, 1993). It rests on findings issued April 8, 1993. -2- The IBEW prevailed in the election held May 11, 1993, whereupon the regional director certified it as the collective bargaining representative of the PCs and SPCs. The Company declined the IBEW's subsequent request to bargain collectively; it still insisted that the PCs and SPCs were supervisors and managers exempt from the proposed bargaining unit. On June 17, 1993, the IBEW filed an unfair labor practice charge. The Board's general counsel then issued a complaint and amended complaint on the charge that the Company refused to bargain in violation of section 8(a)(1) and (5) of the Act, 29 U.S.C.A. 158(a)(1),(5)(West 1973). He subsequently moved to transfer the proceedings to the Board and for summary judgment. On November 24, 1993, the Board granted the motion, as it found no new evidence or special circumstances that would cause it to reexamine its representation decision. It therefore concluded that the Company's refusal to bargain violated the Act. II. In the late 1960s New England's electric utilities created the New England Power Pool ("NEPOOL") to centralize control of the region's power supply. NEPOOL is an association of roughly one hundred utility companies in the six-state region, which in turn operate approximately three hundred power generating plants. NEPOOL is divided into three divisions, NEPOOL billing, which manages transactions within the system; NEPLAN, which forecasts future power needs; and NEPEX, which controls daily power generation and transmission. -3- The Company is responsible for staffing each division pursuant to a service contract with NEPOOL. All support functions are provided by the Company as well, including personnel management, accounting and purchasing. Vacation schedules, exempt payment plans, hiring, evaluation and firing practices are uniformly prescribed by the Company throughout NEPOOL's divisions. Thus, every employee of a NEPOOL operating division is an employee of the Company. NEPEX in Holyoke, Massachusetts, is the master dispatch and control center for bulk power throughout New England. It regulates the day-to-day production, sale and purchase of power by each of the approximately three hundred NEPOOL member utilities. Because of the complexity of this task, NEPEX does not communicate directly with each of the component power plants, but instead relays instructions through four "satellite" operations. The satellites are regionally organized: Rhode Island, Eastern Massachusetts and Vermont are within the "REMVEC" satellite; Connecticut and Western Massachusetts within the "CONVEX" satellite; New Hampshire and Maine each has its own satellite organization. CONVEX employees are also employees of the Company but the other satellites are independently staffed. III. The employees at issue work in the NEPEX control room, the nerve center of all NEPEX operations. The PCs and SPCs (collectively "Coordinators") are responsible for buying and selling power among the member utilities as economically as -4- possible while avoiding power outages. They decide which plants will operate at what times and at what power levels. They set and implement maintenance schedules for both generating plants and transmission elements. If control room equipment should need repair or maintenance, they may order those services from the plant's engineers, in accordance with priorities set in one of fourteen "Operating Procedures" promulgated by NEPOOL to guide the Coordinators in their several responsibilities. The control room is in constant operation; the Coordinators work in teams of three -- one SPC and two PCs -- in twelve-hour shifts. During "business hours," from 8:30 a.m. to 4:00 p.m. on weekdays, a supervisor and assistant supervisor of control room operations also work at the plant; at all other times they are on call. They audit and formally evaluate the Coordinators' overall performance, sometimes with input from the SPCs. During nonbusiness hours, the PCs and SPC are the only employees on duty. The PCs alternate each shift between two positions, the "generation/load" PC and the "transmission/security" PC. The generation/load PC buys and sells "contract" and "economy" power from all member and nonmember plants, and reserves enough unused capacity to ensure continued operation in the event that the largest single generator shuts down. The transmission/security PC monitors the New England bulk power system, prepares for power coverage in the event of a plant shutdown, and has final authority to approve or disapprove -5- transmission outage applications. This employee also has the authority to dispatch power uneconomically if such dispatch contributes to overall system reliability. Further, the transmission/security PC monitors the system to prevent cascading, that is, to ensure that no single transmission element in the system overloads any other transmission element. Ultimately, the security PC may direct limited power outages by reducing voltage or "shedding load" to prevent a more widespread blackout. The SPC's duties are similar to those of the PCs', but rather than looking at the system's minute-to-minute requirements, the SPC forecasts the system's needs from several hours to one day in advance. Witnesses for the Company testified the SPC is "in charge" of the shift. As the more experienced employee in the control room, the SPC may attempt to moderate disputes between the generation/load and transmission/security PCs but there was no evidence that the SPC gave orders or instructions. On the contrary, the record suggests that the SPC is too busy with his/her own duties to oversee the PCs' work. Except for informal discussions with the control room supervisor, the SPC does not evaluate PCs' performance and is not responsible for discipline, termination of employment, or for approving time sheets or leave. During nonbusiness hours, if a PC cannot report to work, the SPC contacts a shift replacement from a preexisting "spares" list. Although NEPEX PCs and SPCs are paid at a higher salary -6- grade than satellite operators, they have no authority to hire, fire, evaluate or promote satellite employees. Should a satellite operator refuse to comply with NEPEX instructions, the PC or SPC would not have the power to discipline or recommend discipline. Instead, the NEPEX coordinator would relate the incident to NEPEX upper management who would contact upper management at the satellite and attempt to resolve the matter. Both PCs and SPCs have substantial authority with respect to NEPEX's day-to-day functions, but even in this respect their discretion is limited by the directives in fourteen NEPEX Operating Procedures. The Procedures define the broad parameters to be followed as the PCs and SPCs conduct the dispatch. However, not every facet of every procedure is dictated by the Operating Procedures and Coordinators are often expected to rely upon their own knowledge, skills and experience to make the system work. IV. Supervisors are excluded from the Act's definition of "employees" and hence may not be included in a bargaining unit designated by the Board. 29 U.S.C.A. 152(3), 159(b) (West 1973). Section 2(11) of the Act, 29 U.S.C. 152(11), defines a "supervisor" as [A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection -7- with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment. The statute is read in the disjunctive, "with the existence of any one of the statutory powers sufficient to confer supervisory status regardless of the frequency of its exercise." Maine _____ Yankee Atomic Power Co. v. NLRB, 624 F.2d 347, 360; NLRB v. __________________________________ _______ Magnesium Casting Co., 427 F.2d 114, 117 (1st Cir. 1970), aff'd _____________________ _____ on other grounds, 401 U.S. 137 (1971). ________________ We are especially deferential to the Board's determination of supervisory status because we recognize the Board's competence and experience in applying the Act to the complexities of industrial life. NLRB v. Erie Resistor Corp., ____________________________ 373 U.S. 221, 236 (1963); Maine Yankee, 624 F.2d at 360. _____________ Further, the "infinite and subtle gradations of authority" existing in the workplace entitle the Board to wide latitude in determining which employees fall within the definition of "supervisor." Marine Eng'rs Beneficial Ass'n v. Interlake S.S. _________________________________________________ Co., 370 U.S. 173, 179 n.6 (1962); Goldies, Inc. v. NLRB, 628 ___ ______________________ F.2d 706, 710 (1st Cir. 1980). Our deference is not unlimited, however; we will only affirm the Board's decision if it is supported by "substantial evidence," drawn from the totality of the record. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 _______________________________ (1951); Maine Yankee, 624 F.2d at 360. ____________ The Company concedes that the PCs and SPCs have no authority to "hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees." -8- Instead, it contends that the Coordinators are supervisors because they "responsibly . . . direct" CONVEX satellite employees and NEPEX engineers, and the exercise of that authority requires the use of independent judgment. PCs and SPCs are unquestionably highly trained employees who use independent judgment to make and implement complex technical decisions that affect the entire region's power supply. They do not, however, "responsibly . . . direct" other employees within the meaning of the statute. "To be responsible is to be answerable for the discharge of a duty or obligation." Maine Yankee, 624 F.2d at 361 (quoting Ohio Power Co. v. NLRB, ____________ _______________________ 176 F.2d 385, 387 (6th Cir.), cert. denied, 338 U.S. 899 (1949)). ____________ The uncontroverted evidence established that the PCs and SPCs are not answerable for the conduct of satellite operators. The NEPEX coordinators are permitted merely to report CONVEX employee failures to NEPEX upper management, and it is upper management at the satellite that is ultimately responsible for the actions of CONVEX operators. By the same token, although PCs and SPCs use independent judgment within the guidelines of the Operating Procedures to determine whether and when to direct engineers to service control room equipment, there is no evidence that they answer for engineering or equipment failures. The Company maintains that the SPCs, as the senior employees in the control room during nonbusiness hours, also supervise PCs. However, its assertion that SPCs were in "charge of the shift" in the control room supervisor's absence, is also -9- not supported by the evidence. Nothing in the record suggests that they had ultimate responsibility for the plant's performance during nonbusiness hours, in fact the record notes that a supervisor is always on call. Moreover, SPCs do not evaluate PCs' performance, although the control room supervisor may request SPCs' input. SPCs do not have authority to hire or to assign work; only as a matter of routine may they fill an open shift from a preexisting list. If the SPCs moderate disputes, the outcome is not ultimately their responsibility. Finally, and most importantly, SPCs are simply not held accountable if a PC disobeys a direct order, misquotes a price or causes a blackout. Petitioner relies heavily on Maine Yankee, 624 F.2d at ____________ 347, in which we reversed the Board's determination that a power plant's Shift Operating Supervisors ("SOSs"), who had duties similar to those of the Coordinators here, were not supervisors under the Act. Its reliance is misplaced. In that case we found that the SOSs did responsibly direct other employees because "should anything go wrong with respect to the plant's electric power output, '[the SOS] is the one that would have to answer why.'" Id. at 361. The Coordinators in this case may direct __ CONVEX operators, but they are not responsible for what the satellite employees actually do. Further, in Maine Yankee, the ____________ Board ignored or depreciated evidence that the SOSs used independent judgment in their direction of other employees. Here the Board implicitly recognized that the Coordinators are highly trained employees with substantial discretion, within the -10- Operating Procedures, to instruct other employees. The Board, however, refused to take the further step of concluding that PCs and SPCs were responsible for other employees' actions, and in that, we conclude, it was correct. V. The Company also argues that PCs and SPCs are managerial employees and therefore exempt. The Act itself does not explicitly exclude managers, but they have been excluded by judicial interpretation because managers' interests are so aligned with the interests of the employer that managers cannot be deemed employees for the purposes of the Act. NLRB v. Bell ____________ Aerospace Co., 416 U.S. 267, 283-89 (1974). Managers are defined _____________ as those who "'formulate and effectuate management policies by expressing and making operative the decisions of their employer.'" NLRB v. Health Care & Retirement Corp., 114 S. Ct. _______________________________________ 1778, 1782 (1994) (quoting Bell Aerospace, 416 U.S. at 288); ______________ Boston Univ. Chapter, Am. Ass'n of Univ. Professors v. NLRB, 835 ____________________________________________________________ F.2d 399, 400 n.3 (1st Cir. 1987). Generally, employees may be excluded from a bargaining unit on the basis of managerial status only if they "represent[] management interests by taking or recommending discretionary actions that effectively control or implement employer policy." NLRB v. Yeshiva University, 444 U.S. __________________________ 672, 683 (1980). The Company's argument is unpersuasive given the paucity of evidence tending to show managerial powers in the PCs or SPCs. Management policy at NEPEX is embodied in the Operating -11- Procedures formulated by the Operations Committee. There is no evidence that PCs or SPCs have a role in the creation or implementation of the Operating Procedures. Certainly the Coordinators may sometimes depart from the Procedures, but they do not have the authority to issue new ones. Finally, at the core of the managerial question is the alignment of workers' and employer's interests. Other than the common goal of keeping the lights on, the record shows no such congruence of interests between the Company and the Coordinators sufficient to warrant the latter's exemption from the Act. VI. It is the function of this Court to review the Board's decision in accordance with the "substantial evidence" test. It is the Board's "primary function to determine those who as a practical matter fall within the statutory definition of a 'supervisor.'" Interlake S.S. Co., 370 U.S. at 179 n.6. The __________________ Board undoubtedly had substantial evidence on the record as a whole to conclude that the PCs and SPCs did not meet the current definition of "supervisors." However, when the Board and the courts set upon the task of defining a supervisor for the purposes of the statute, neither contemplated the type of quasi- professional, quasi-overseer employee encountered in this case and others in the public utilities setting. It may profit the Board to reexamine its views in this field. The Company's petition for review is denied and the Board's application for enforcement of its order is granted. -12- Affirmed. Affirmed ________ -13-