**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HAMILTON PLASTIC MOLDING COMPANY, Respondent.**

No. 14958.

United States Court of Appeals Sixth Circuit.

Feb. 6, 1963.

Marion Griffin, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Stuart Broad, Atty., N.L.R.B., Washington, D.C., on the brief), for petitioner.

J. Mack Swigert, Cincinnati, Ohio (Frank H. Stewart, Cincinnati, Ohio, on the brief; Robert G. Woellner, Cincinnati, Ohio, of counsel), for respondent.

Before McALLISTER, MILLER, and O'SULLIVAN, Circuit Judges.

McALLISTER, Circuit Judge.

This is a petition for enforcement of an order of the National Labor Relations Board which found that Local Union 156, Upholsterers' International Union of North America, AFL–CIO, was the bargaining agent of respondent's employees, and that respondent was guilty of unfair labor practices in refusing to bargain collectively, as well as violating the National Labor Relations Act in interrogating employees about their Union membership and using threats and promises in violation of the law.

The Hamilton Plastic Molding Company is an Ohio corporation. It is a small organization engaged in the manufacture of plastic products, principally toys. Its busy season is from about the first of September until shortly before Christmas. Its complete staff, including supervisors, ranges from eight in the slack season, to as many as thirty in the busy season. It employs a single clerical employee, a toolmaker, and a varying number of machine operators. It has its plant and place of business in New Burlington, Ohio.

On May 9, 1960, four of the men working for the company went to the office of Local Union No. 156, and told Arthur Cook, the Union's business manager, that "they were interested in trying to put a Union into their plant."

One of the four men was Anthony Michaels, foreman of the company's third shift. Another was Lonnie Whitaker, a machine operator, and an employee within the meaning of the National Labor Relations Act. The other two were Frank Papania and Lawrence Heis, whose status as foremen or as employees, was, and is, in dispute. These four men each signed one of the Union's combination bargaining authorization and check-off cards, and returned to Cook the next day with similar cards signed by seven more of the company's machine operators. The company's payroll list for May 10, 1960, included the plant superintendent, Foreman Michaels, and another shift foreman (who were admittedly supervisors), and also the only clerical employee. There was also one machine operator, Anglian, who was solicited by a foreman to sign a card. Altogether, there were nineteen persons on the payroll, counting the two supervisors, the clerical employee, and the machine operator who had been solicited to sign the authorization by a foreman. Omitting these four, there were fifteen on the payroll. It is claimed by respondent company that, of these fifteen, two were supervisors, namely: Papania and Heis. Counting Papania and Heis as employees rather than as supervisors, the Union had in its possession on March 10, 1960, the apparently valid bargaining authorizations of ten out of fifteen of the company's production employees. If Papania and Heis, whose status is in dispute, as above mentioned, are to be considered supervisors, the Union had the bargaining authorizations of eight out of thirteen of the company's employees. Considering Papania and Heis as supervisors rather than employees, the Union still had a majority of bargaining authorizations of the company's employees on May 10, 1960. However, if Papania and Heis were supervisors, the bargaining authorizations solicited by them from the employees would be invalid, and the Union would not have had a majority authorizing it to act as bargaining agent.

The crucial question, therefore, is whether Papania and Heis were super-

visors or employees. A further question for determination in this proceeding is whether respondent company was guilty of unfair labor practices in interrogating its employees as to their Union membership, and indulging in threats and promises, thereby interfering with, restraining, and coercing its employees in the exercise of their rights under the Act.

We do not have before us any question of reinstatement of employees discharged by respondent company, or liability of the company for back pay to any employees. In the original complaint, the Board alleged that respondent company had committed unfair labor practices by discriminatory layoffs of Frank Papania, Lawrence Heis, Lonnie Whitaker, and Robert Kichler, the leaders of the Union organization movement. However, at the beginning of the hearing before the Trial Examiner, the General Counsel moved to strike this allegation of discriminatory layoffs, and the motion was granted.

The Trial Examiner found that Papania and Heis, as well as Foreman Michaels, were supervisors.

Papania testified on the hearing that he was first hired in 1959; that four months later he became assistant foreman on the first shift; that later he became foreman on the third shift; that thereafter he became assistant foreman on the first shift; and that he was more or less in charge of the first shift in the room when the plant superintendent was not there. It was conceded by the General Counsel that Papania was a "supervisor" as defined in the Act, while he was foreman of the third shift.

The reasons for the findings and conclusions of the Trial Examiner are best set forth in his report as follows:

"Coming now to the disputed question of whether Papania and Heis were supervisors on May 10, 1960, it appears that Papania was then working on the first shift from 8 a.m. to 4 p.m., that Heis was working on the second shift from 4 p.m. until midnight, and that the functions and duties of the two men were the same on their respective shifts. At the time, the Respondent was running three shifts, with from three to five machine operators on each shift. Superintendent Lew Babbitt was in overall charge of the plant and, since Babbitt was normally in the plant from 7 a.m. until 5 p.m., there was no foreman for the first shift on which Papania worked. Apparently because of Babbitt's absence during the other two shifts, Foreman Ray Stemmerding was in charge of the second shift on which Heis worked, and Foreman Anthony Michaels was in charge of the third shift from midnight to 8 a.m.

"Until May 2, 1960, Papania had been foreman of the third shift but, at his own request, he was then transferred to the first shift and replaced by Michaels as foreman on the third shift. According to Papania's testimony, upon his transfer to the first shift, he was told by Superintendent Babbitt that he was to be an 'assistant foreman.' Although Papania also testified that his wage rate was reduced 10 cents per hour, it appears from his canceled wage check, that his wage rate remained the same as it had been when he was foreman on the third shift.

"In performing their work on their respective shifts after May 2 (and thus on May 10, the critical date in this case), Papania and Heis sometimes operated the machines, relieved the other operators for dinner and other work breaks, mixed materials, filled the hoppers, repaired machines when they broke down, and even swept the floor. In these respects, Papania's job after May 2 was the same as it had been before May 2 when he was foreman on the third shift. The evidence is in conflict, however, as to whether Papania and also Heis, had any such authority in directing the work of

the machine operators as would make them supervisors within the meaning of Section 2(11) of the Act.

"According to Papania, his job on the first shift was the same as his job as foreman on the third shift 'except for the responsibility.' He explained that, as third shift foreman, he assigned operators to machines and to new jobs, unless on special work Babbitt made a particular assignment to an operator, and that he also permitted operators to go home when they were sick. But according to Papania, Superintendent Babbitt was always in the plant during the first shift, although perhaps in another room, and Papania, during his short service on the first shift, merely relayed Babbitt's instructions to the girl operators. But Babbitt testified that, as he had informed Papania, Papania was in complete charge of the first shift when Babbitt was not there. Upon Babbitt's testimony to this effect and Papania's admission that Babbitt had said he was to be an assistant foreman when he was transferred to the first shift on May 2, I conclude that Papania did in fact have authority responsibly to direct the work of employees on his shift and that not only he, but also Heis whose job was identical on the second shift, were supervisors within the meaning of Section 2(11) of the Act. Consequently they were not employees within the appropriate unit which the Union sought to represent and neither they nor their cards may be counted in determining whether the Respondent was designated as bargaining representative by a majority of the employees in the unit. I further find that, with the proper exclusion of Papania and Heis as supervisors, the appropriate bargaining unit of production employees which the Union seeks to represent, consisted on May 10, 1960, of only 13 employees.

"My conclusion that Papania and Heis, as well as Foreman Michaels, were supervisors has an even broader significance affecting the Union's claim of majority. For these three supervisors along with employee Whitaker not only started the Union's organization of the Respondent's employees by their visit to Business Manager Cook's office on May 9, but thereafter procured the signatures of employees on the remaining seven of the bargaining authorization cards submitted by the General Counsel and the Union at the hearing. Thus, according to uncontradicted evidence, Foreman Michaels procured the signature of Louise Anglian; Papania procured the signatures of employees Fay Gullett, Eve Fowlie, Rosie Thompson, and Joyce Stoelting; and Heis, in the company of employee Whitaker, procured the signatures of employees Betty Jo Noah and Robert Kichler. In this situation, I find that the seven cards procured by Supervisors Michaels, Papania, and Heis, are not to be counted as clearly free designations by the employees of the Union as their exclusive bargaining representative, and that the only apparently free and effective bargaining authorization submitted by the Union was that of employee Lonnie Whitaker. Upon the foregoing considerations, I conclude that the Union has shown only one effective bargaining authorization from the 13 employees composing the production unit appropriate for collective bargaining. Since the Union was therefore not freely designated as exclusive bargaining representative by a majority of the employees in the unit, the allegation of the complaint that the Respondent has refused to bargain with the Union in violation of Section 8(a) (5) and (1) of the Act, has not been proved. I shall therefore recommend a dismissal of this allegation of the complaint."

■ There was a conflict between the testimony of Papania and Superintendent Babbitt in regard to the extent of Papania's authority. However, it was for the Trial Examiner to pass upon the weight of the evidence and the credibility of the witnesses, and the findings and conclusions of the Trial Examiner that Papania and Heis were supervisors were sustained by substantial evidence.

The Board reversed the Trial Examiner as to Papania and Heis, stating:

"In view of the routine work of the assistant foreman and the machine operators, the small number of employees working on each shift, and the fact that during each shift there was an admitted supervisor on duty at all times, we are satisfied that the authority and responsibility delegated to Papania and Heis were extremely limited. Even admitting that they may have made some assignments or transfers of machine operators, we believe that the Trial Examiner erred in concluding that this constituted an exercise of authority responsibly to direct the work of other employees."

In Section 2(11) of the National Labor Relations Act, (29 U.S.C.A. §§ 151–197), a supervisor is defined as follows:

"The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

■ When the Trial Examiner and the Board disagree on the evidence, we may not disregard the superior advantages of the Examiner, who heard and saw the witnesses, for determining their credibility. Ohio Associated Telephone Company v. N. L. R. B., 192 F.2d 664, 668 (C.A.6). See Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 495, 496, 71 S.Ct. 456, 95 L.Ed. 456.

In Ohio Power Company v. N. L. R. B., 176 F.2d 385, 388, 11 A.L.R.2d 243 (C.A. 6), this court set aside the Board's determination as to supervisory powers, and sustained the Trial Examiner, and, in so ruling, stated:

"Section 2(11) covers any individual 'having authority * * * responsibly to direct * * *.' It does not require the exercise of the power described for all or any definite part of the employee's time. It is the existence of the power which determines the classification. That power responsibly to direct exists here is uncontradicted. The control operator at all times responsibly directs the assistant control operator and the auxiliary equipment operator. * * * It is undisputed that in the absence of the shift operating engineer the responsibility rests upon the control operator to direct other employees in the handling of emergencies; that an emergency may require split second action, and that the control operator exercises this authority not as a matter of routine, but by the use of independent judgment."

See also N. L. R. B. v. Mt. Clemens Metal Products Company, 287 F.2d 790 (C.A.6).

In accordance with the foregoing, we are of the view that the Board erroneously reversed the findings of the Trial Examiner that there was no unlawful refusal to bargain.

■ A review of the record discloses, however, that there is substantial evidence to sustain the findings and conclusions of the Trial Examiner, which were affirmed by the Board, that respondent was guilty of unfair labor practices in interrogating its employees as to their Union membership and indulging in threats and promises, thereby interfering

with, restraining, and coercing its employees in the exercise of their rights under the Act.

The order of the National Labor Relations Board is, therefore, modified as hereinbefore indicated, and, as so modified, enforcement thereof is decreed.