**CITY OF DES MOINES, Iowa, a Municipal Corporation, Appellee,**

v.

**PUBLIC EMPLOYMENT RELATIONS BOARD, an agency of the State of Iowa, Respondent,**

v.

**DES MOINES ASSOCIATION OF PROFESSIONAL FIREFIGHTERS AFL–CIO, LOCAL NO. 4, Intervenor-Appellant.**

No. 2–60089.

Supreme Court of Iowa.

March 22, 1978.

Harry H. Smith of Smith & Smith, Sioux City, for intervenor-appellant.

John R. Phillips and Russell L. Samson, Des Moines, for appellee.

McCORMICK, Justice.

This is an appeal by intervenor Des Moines Association of Professional Firefighters AFL–CIO, Local No. 4, from a district court judgment ordering modification of a Public Employment Relations Board (PER Board) decision. The PER Board ruled that line captains and lieutenants in the Des Moines fire department are not excluded from the public employee bargaining unit as supervisory employees under Code § 20.4(2). Petitioner City of Des Moines obtained review of this decision in district court pursuant to Code § 17A.19. The trial court held the PER Board decision is not supported by substantial evidence and entered judgment requiring the PER Board to modify its decision by excluding the captains and lieutenants from the bargaining unit. Upon intervenor's appeal, we reverse the trial court.

We have separately decided *City of Davenport v. Public Employment Relations Board,* Iowa, 264 N.W.2d 307 (filed this date). Principles of review and applicable legal principles are discussed in that case. The sole question here is whether the PER Board decision ascribing nonsupervisory status to Des Moines fire department line captains and lieutenants is supported by substantial evidence.

Intervenor initiated an action before the PER Board in August 1975 to obtain a bargaining unit determination. Evidence was received before a hearing officer in a contested proceeding in October 1975, and in February 1976 the hearing officer issued his findings of fact, conclusions of law and recommended decision. The City appealed to the PER Board pursuant to § 17A.15(3),

The Code. One of the three Board members recused himself from hearing the appeal. The remaining two members affirmed the hearing officer, although one of them issued a separate opinion expressing the view that captains and lieutenants who serve as station commanders are supervisory employees.

In relevant part, the findings of fact of the hearing officer are as follows:

The Des Moines Fire Department employs approximately 323 persons, excluding the clerical staff. The department consists of the chief, the assistant to the chief, 10 district chiefs, 22 captains, 39 lieutenants, one maintenance superintendent, one fire marshal, and approximately 248 other persons in admitted non-supervisory ranks. The fire department is one of 12 major departments of the City of Des Moines which are under the direct control of the city manager. The department is responsible for the fire protection of the approximately 65 square miles and over 200,000 persons constituting the City of Des Moines.

The department may be divided into five functional units: administration, consisting of the chief, assistant to the chief, and four dispatchers; maintenance, consisting of the maintenance superintendent and four equipment mechanics; training, consisting of the training officer (who is a district chief), and one captain; fire prevention, consisting of the fire marshal, two senior fire inspectors, and six fire inspectors; and the fire suppression unit, consisting of the remaining department personnel. The training, maintenance, and fire prevention units are staff units which report directly to the administration unit.

The fire suppression unit performs the line functions of the department and is organized into three geographical districts. Two of these districts contain three fire stations while the third district contains four stations. The fire suppression unit operates in three shifts (technically called divisions) of 24 hours each. Each shift of each district is headed by a district chief, and each shift of each station is headed by either a captain or lieutenant depending on

the number of companies assigned to the station. A company is made up of a piece of equipment, e. g. a ladder truck, the man assigned to it and the company officer who may be either a captain or a lieutenant. Lieutenants are station commanders in stations comprised of a single company while captains are station commanders at stations of more than one company.

The activities of the fire stations may be divided into four categories: training, house duties, inspections and fire fighting. The responsibilities of captains and lieutenants who are station commanders are identical, except for the number of men and pieces of equipment under their jurisdiction. Lieutenants in stations under the command of captains are not responsible for the operation of the station as a whole, but are responsible for the operation of their company. Such lieutenants do not have the responsibility to assign house work, maintain the station journal, or perform other duties which are the responsibility of the station commander.

Fire fighting activities of the department fall into two general categories: "still" alarms which are generally non-structural fires such as automobile or brush fires; and "regular" alarms, which involve fires in structures such as houses, apartments, or commercial buildings. If the fire is, in a large structure or of a serious nature, additional alarms may be sounded resulting in the assignment of more men and equipment to the fire.

A still alarm fire is generally fought by a single company unless the company officer requests additional help. Many still alarms in Des Moines are fought by "attack wagons", modified pickup trucks manned by an engineer and a fire fighter (but not a company officer). A regular alarm fire is always responded to by at least two companies and a district chief.

The district chief often arrives first on the fire scene and almost never more than three to five minutes after arrival of the first company. The district chief is in charge of the operation of all companies at the scene, and under his general supervision, company officers instruct their men where to apply water or use smoke ejectors or other such tactical matters. Company officers testified that their decisions were instinctive, based upon their long tenure in the department and extensive training in fire fighting techniques.

In addition to their command at the fire scene, district chiefs are responsible for the activities of the stations within their district. District chiefs are the highest ranking officers on 24 hour duty. They have the authority to transfer men from station to station within their district as personnel needs dictate. They have the final authority to approve "trading time" requests by all personnel within their district. The district chiefs also participate in command staff meetings called by the chief at irregular intervals to formulate departmental policy and the vacation schedule. Absences from all stations must be reported to them by the company commanders. District chiefs, in conjunction with the training officer, approve requests by the company officers to deviate from predetermined training schedules. Only district chiefs have the authority to grant employees sick leave or other forms of emergency leave.

A station commander or "officer in charge" is the highest ranking officer assigned to a station. Single company stations are commanded by a lieutenant; multi-company stations are commanded by a captain. Where the station commander is a captain, the other company is headed by a lieutenant. Station commanders and company officers are responsible for a number of reports describing the station and company activities including inspection reports, brush fire reports, automobile fire reports, and others. Station commanders also keep the station log in which all events of the day are recorded.

Station commanders are responsible for overseeing the house duties at the station. This includes the general custodial work necessary to maintain the stations in a clean and orderly condition. While station commanders may assign these house duties to the men in any manner, the men are

generally allowed to pick their duties by seniority.

Company officers are responsible for conducting company training sessions and inspections. The training schedule is determined by the training officer and company officers have no authority to deviate from the schedule without the approval of their respective district chief who in turn contacts the training officer. Training sessions conform with the instructions of the chief, the training officer, and department training manuals. Inspection procedures are highly standardized by departmental policies.

Company officers have no authority to hire, transfer, suspend, lay-off, recall, promote, discharge or reward other employees. Company officers do have some authority in the areas of discipline, adjustment of grievances, and recommendations to their superior officers.

The authority of company officers to discipline other employees of the department is limited to oral warnings. For example, company officers have the authority to require a subordinate to correct house work to meet the required standards. More significant disciplinary measures must be sought by "pressing charges" against the subordinate, who also has the right to press charges against a superior officer. The record in this case does not provide any examples of differences in the way a charge originated by a non-officer and an officer would be handled by the chief. The chief testified that he had a practice of investigating disciplinary problems before taking action on them. One officer testified that he had assigned a man to kitchen duties at the headquarters as "punishment" for his activities. The company officer in this case had been ordered by a superior to provide a man for this duty on that day and his right to use this duty as a disciplinary measure was limited to choosing an employee to perform the assignment.

Company officers prepare monthly evaluations of probationary employees and annual evaluations on permanent employees. District chiefs prepare a separate and independent review of these employees at the same intervals. Chief Williams testified that he generally followed the recommendation of these officers in retaining probationary employees and granting pay increases to permanent employees. If the recommendations of the company officer and the district chief were in opposition, he would conduct an investigation of the matter before taking action.

Promotions within the fire department are pursuant to civil service laws. As a part of this process company officers complete rating forms for individuals eligible for promotion. These ratings determine not more than 10 percent of an employee's total score. Only persons successfully completing written examinations are placed on the promotional list. The ratings prepared by the officers may be examined by the chief, but he makes the ultimate promotional decision.

The chief makes the initial assignment of men to a particular shift and station. District chiefs, however, have the authority to transfer men from station to station during a shift. Although the record is not entirely clear, it would appear that two district chiefs may arrange the transfer of an employee from one division to another subject to the chief's approval. The assistant to the chief testified that his recommendation is frequently sought on transfers by the chief. Station commanders have the authority to assign men under their command to a specific piece of equipment. This authority is limited by the rank and qualifications of the men available.

The City of Des Moines has a formal grievance procedure with the following steps: immediate supervisor, department head, employment relations department, and city manager. The City grievance procedure applies to the fire department. The city manager and the chief testified that under this grievance procedure company officers would be the first step. Several company officers testified that they would be the person to whom "gripes" would be brought. Unless the matter was within their power to control, the employee would

be referred to a superior officer. Grievances brought by the employee organization are presented to the chief rather than a lower ranking officer. (This system is informal in nature as there is not a written contract or memorandum of agreement between organization and the City).

The assistant to the chief receives 30.5 percent more pay than a district chief. Captains receive 20 percent less than district chiefs and 10 percent more than lieutenants. Lieutenants receive 3.5 percent more than senior fire rescue engineers who are admitted by the Employer to be nonsupervisory persons.

Insofar as relevant, the hearing officer's conclusions of law are as follows:

The remaining positions in dispute are those of lieutenant and captain. Although there are differences between the job duties of lieutenants and captains, on the whole such differences do not require separate handling of these two ranks. The primary difference between these positions is that a captain will always be a station commander while a lieutenant acts as a station commander only in stations housing a single company. The examples of duties which are found in the job descriptions of the fire captain and fire lieutenant are, in as far as they are relevant for this proceeding, identical, thereby permitting these two ranks to be handled in the same manner.

Neither captains nor lieutenants hire, transfer, suspend, lay-off, recall, promote, discharge or reward employees on their own motion. Company officers do assign men to specific pieces of apparatus and to house duties within their stations. I find that these assignments, which are generally given on the basis of either rank or seniority, are routine and clerical in nature and, therefore, not sufficient to find company officers to be supervisors.

Company officers clearly make recommendations concerning the discipline, promotion, retention of probationary employees, and the transfer of permanent personnel of the department. The question to be addressed is whether those recommendations are "effective" as interpreted by the Board. In *Davenport Community Schools, supra,* a majority of the Board defined effective recommendation as that which,

"under normal policy and circumstances is made at the chief executive level or below, and is approved by higher authority without independent review or de novo consideration as a matter of course. Hence, these effective recommendations, absent unusual or extraordinary circumstances, become operative decisions in the conduct of the public employer's operations".

The evaluation reports completed by the company officers are recommendations to the chief concerning the retention of probationary employees and the granting of discretionary step increases to permanent employees of the five department. Using the definition of effective recommendation found in *Davenport Schools,* neither of these evaluations is adopted by the employer without an independent review since in both cases an independent evaluation is completed by district chiefs. The testimony of the chief indicates that should the district chief and the company officer disagree in their reports, a further investigation is conducted. Thus, the evaluations which are completed by company officers are not approved by "higher authority without independent review or de novo consideration as a matter of course."

In *City of Davenport,* PERB Case No. 27, (1975), the Board considered the authority of captains and lieutenants of the department to discipline other employees. There, as here, the authority to discipline was limited to verbal reprimands. There, as here, company officers had the right to press charges against subordinate personnel. There, as here, disciplinary action would not be taken without some independent review of the facts surrounding a discipline problem by the chief or other higher ranking personnel. Company officers in the *Davenport* case whose disciplinary authority appears to be identical to that of the company officers in this case were not excluded from the bargaining unit by the Board.

Because rating reports completed by company officers for employees seeking promotion within the department constitute not more than ten percent of the total ranking of employees eligible for promotion, I find that those reports do not constitute an effective recommendation as that term is defined in *Davenport Schools, supra*. Further, the same process appears to have been followed in the City of Davenport among the fire department personnel there. In that case the Board did not exclude company officers who completed rating reports as a part of the promotional process administered by the Civil Service Commission.

Company officers and station commanders in particular, are "in charge" of the men assigned to them. The exercise of their authority to direct the men under them may be divided into two general activities. The first and larger of these categories is the direction of men at the fire station. The record indicates that functions performed at the fire station, including training, house duties, and maintenance of the equipment, are highly standardized activities as a matter of departmental policy. Inspection work, which is performed by the companies, is also highly routinized by departmental order. Thus, I find that the direction of employees at the fire station is routine and clerical in nature, and does not require the use of independent judgment on the part of the company officers.

The activities of the fire company at the fire scene are also largely standardized by the departmental policies. Company officer decisions at the fire scene include the number of lines to lay to the fire from the nearest hydrant, the size of the hose to use, and the allocation of smoke ejection equipment and other tactical decisions. The district chief maintains the overall supervision of the fire scene and frequently arrives at the scene prior to the other companies. The decisions of the company officers are the result of long experience in the fire service and standardized departmental policies. Decisions made by company officers at still alarm fires, to which no district chief responds, are the same decisions which must be made by engineers and fire fighters as-

signed to attack wagons. These decisions are again tactical decisions, requiring the officer to decide the number of lines to lay to the fire, and the size of the hose and other such matters. Additionally, at a still alarm fire a company officer may be required to decide whether or not to request additional help. I find that as a whole these decisions are routine in nature, based upon detailed departmental policies for the handling of such fires and the company officers' training and service in the fire department.

By municipal ordinance the first step of the grievance procedure in the fire department is the immediate supervisor of the grieved employee. By contrast the Act provides that a supervisory employee is one who has the authority to adjust grievances or effectively to recommend such action. Thus, the issue for the Hearing Officer to consider is the *authority* of captains and lieutenants of the Des Moines Fire Department to adjust grievances. The record indicates that employees bring "gripes" to the station commander for their resolution. Since the authority of company commanders is limited to routine and clerical matters, and absent any additional power in the company officers to take special action based on employee grievances, I find that the authority to company officers to adjust grievances relates only to routine and clerical matters and does not require the use of independent judgment.

The Public Employer, in its brief, makes numerous policy arguments for excluding company officers from collective bargaining units. However, these arguments and the authority cited therein must be considered secondarily to decisions of this Board. In the case of *City of Davenport, supra*, the Board considered many of the same questions presented to this Hearing Officer and concluded that captains and lieutenants were properly included in the appropriate unit. It is the opinion of the Hearing Officer that there are insufficient distinctions between the Davenport case and this case to come to a contrary conclusion. Thus, I find that the appropriate unit for purposes

of collective bargaining within the meaning of [§ 20.13(2), The Code] is:

INCLUDED: All persons engaged in fire fighting or fire prevention who are permanent paid employees of the Fire Department of the City of Des Moines, including the following classifications: fire fighter, fire engineer, senior fire rescue engineer, fire prevention inspector, senior fire prevention inspector, fire lieutenant, fire equipment mechanic, fire dispatcher, and fire captain.

EXCLUDED: Fire chief, assistant to the chief, district chiefs (including training officer), fire marshal, and fire maintenance superintendent.

As shown by the hearing officer's findings of fact, the evidence in this case is different in some respects from that received in the *City of Davenport* case. However, when the whole record is viewed, those differences are not significant.

The hearing officer's conclusions of law disclose the decision in this case is based upon application of the same legal principles as were employed in the *City of Davenport* PER Board decision.

Our opinion in the *City of Davenport* case is controlling on the issues involved here. Upon the principles and under the reasoning in that case, the PER Board decision in this case is supported by substantial evidence when the record is viewed as a whole. Consequently, we hold the trial court erred in ordering modification of the PER Board bargaining unit determination.

REVERSED.

All Justices concur except REYNOLDSON, LeGRAND and REES, who dissent.

REYNOLDSON, Justice (dissenting).

I respectfully dissent.

Because I agree with majority the factual differences between this case and the *City of Davenport* case, filed today, are insignificant, this dissent shall be confined to the *City of Des Moines* record but include an examination of the law discussed in *City of Davenport*.

I. *Scope of review.*

I agree with majority's scope-of-review analysis laid out in division I, *City of Davenport*. A party is entitled to a remedy when substantial rights have been prejudiced in a contested case by agency action which is "unsupported by substantial evidence in the record made before the agency when that record is viewed as a whole." § 17A.19(8)(f), The Code. But such a review "must take into account whatever in the record fairly detracts from its weight" and requires consideration of "the record in its entirety * * * including the body of evidence opposed to the Board's view." *Universal Camera Corporation v. National Labor Relations Board*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–465, 95 L.Ed. 456, 467–468 (1951).

The majority properly draws the distinction between such a review and the review accorded to fact-findings which inhere in a jury verdict or the fact-findings of trial judge in a law action tried to the court. In light of quotations from older Iowa cases in the *Davenport* district court decision, it is by no means clear the court was cognizant of the *Universal Camera* review rule.

Although majority invokes "the duty of courts to grant appropriate deference to agency expertise" we should recognize these decisions were filed in the first year of PER Board's existence. In the *Des Moines* case one of the three Board members recused himself from hearing the appeal, as noted by majority. The remaining two split on the question whether captains and lieutenants who serve as station commanders are supervisory employees. Chairman Kolker's extensive footnoted references to the record are omitted in the following quotation from his separate opinion:

"First, the Hearing Officer found, and the record substantiates, that station commanders constitute the first step in the resolution of grievances. Denoting these grievances 'gripes,' and incorporating his conclusion that the overall authority of 'company commanders' was limited to routine and clerical matters, the Hear-

ing Officer found that those officers did not exercise independent judgment in adjusting grievances. Although the Hearing Officer did not explicate the nature of grievances within the power of station commanders to control, my study of the record leads me to conclude that those grievances are what one would reasonably expect at the *first* level of supervision (such as inequitable work assignments, etc.) Moreover, the record is without contradiction that station commanders are encouraged to handle most incidents at the station level, resolve station problems at the station level, and settle a grievance at the first level. It is my opinion that the resolution of those grievances cannot be equated by rote with other levels of responsibility of the station commander, and that such resolution, requires the use of independent judgment. Further, I believe that it is to be expected that a major grievance with policy implications would *not* be resolved by a first-line supervisor, but would normally be forwarded to those empowered to formulate policy.

"Secondly, it is my opinion that station commanders exercise authority to discipline men under their command. While the Hearing Officer found that authority to be limited to oral warnings, he also found authority to 'require a subordinate to correct housework' and that one station commander assigned a man to kitchen duties at headquarters as punishment for his activities. Again, it is my opinion that this is the type of discipline that one might reasonably expect from a first level supervisor, and that suspensions and discharges would normally require the involvement of a higher authority. Moreover, it is my opinion that the ability of any employee to 'press charges' against any other employee, be he a superior or subordinate, is irrelevant to the issue of the station commander's authority to discipline those under his command.

"Thirdly, it is my opinion that station commanders, and only station commanders, assign all of the personnel and the work performed by those at the station.

The discretion which they exercise in work assignments is evidenced by Employer's Exhibit 16, in which it is clear that station commanders have full freedom in assignments, and that such assignments may be without regard to seniority. This example involved the assignment of men to attack units and with the seniority factor being specifically excluded, the station commander could only have been left to exercise his independent judgment.

"It is significant in this regard, and perhaps also to the areas of grievances and discipline, that the stations are geographically remote from each other, and that each contain men and equipment performing the mission of the employer with only a fifteen minute to half-hour visitation by a higher authority during a twenty-four hour shift. I cannot escape the conclusion that someone is enforcing the rules, regulations and orders of the department, and maintaining the proper level of training of men and maintenance of equipment. I believe that someone is the station commander, and that those responsibilities are significant and require the use of independent judgment. I also believe that the terms of a collective bargaining agreement must, by definition, be administered; that the only place it can be substantially administered is at the station where the employees are located; and that management's representative is the station commander.

"Finally, it is uncontradicted that station commanders, in addition to the above responsibilities, are responsible for maintaining station property and equipment, conducting training, evaluating probationary and permanent employees, recommending step pay increases for men in their command, and rating employees for promotion. Station commanders wear distinct uniforms, do not perform physical work in the station (excepting house chores which is voluntary on their part), and have a separate office in the newer stations, and perceive themselves as supervisors. In addition, their job descrip-

tions clearly contemplate the exercise of supervisory authority. While the above items and activities may not, standing alone, constitute 'secondary indicia' of supervisory status which, in conjunction with the responsibilities of station commanders regarding adjustment of grievances, discipline and assignment make the conclusion inescapable that they are supervisors as that term is defined in Section 4(2) of the Act. I recognize that this conclusion is inconsistent with my participation in the *Davenport* and *Cedar Rapids* decisions and to the extent of those inconsistencies constitutes a change in my position."

Thus the *Davenport* decision is now unsupported by the then chairman of the PER Board. The hearing officer's decision in *Des Moines* is supported by only one Board member and has been reversed in a carefully considered district court decision. In these circumstances the deference-to-agency concept should have only limited application.

## II. *Legal principles.*

To place the issue which confronts us in perspective, it should be noted the 1947 Taft-Hartley Act provision for exclusion of supervisors from collective bargaining units was a congressional rejection of *Packard Co. v. N. L. R. B.*, 330 U.S 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947), which upheld an N.L.R.B. ruling that foremen could constitute an appropriate unit for collective bargaining. See *N. L. R. B. v. Bell Aerospace Co.*, 416 U.S. 267, 277–278, 94 S.Ct. 1757, 1763–1764, 40 L.Ed.2d 134, 144–145 (1974).

Pertinent as disclosing subsequent congressional intent is the following from Mr. Justice Douglas' *Packard* dissent, 330 U.S. at 494, 67 S.Ct. at 794, 91 L.Ed. at 1051–1052:

"The present decision * * * tends to obliterate the line between management and labor. It lends the sanctions of federal law to unionization at all levels of the industrial hierarchy. It tends to emphasize that the basic opposing forces in industry are not management and labor but the operating group on the one hand and the stockholder and bondholder group on the other. * * * The struggle for control or power between management and labor becomes secondary to a growing unity in their common demands on ownership."

If the words "citizens and taxpayers" are substituted for the words "stockholder and bondholder group" and "ownership" in the above quotation, the public employment issue comes into focus. "The need for the distinction [between managerial employees and rank-and-file employees] is perhaps greater in public employment where there are no vested 'employers' as owners or a management associated with employing owners." *Shelofsky v. Helsby*, 32 N.Y.2d 54, 61, 343 N.Y.S.2d 98, 103, 295 N.E.2d 774, 777 (1973), dism., 414 U.S. 804, 94 S.Ct. 60, 38 L.Ed.2d 41 (1973).

Congress' purpose in amending §§ 2(3) and 2(11) of the federal act to define supervisors and exclude them from bargaining units was to redress a perceived imbalance in labor-management relationships that was found to arise from putting supervisors in the position of serving two masters with opposing interests. *Beasley v. Food Fair of North Carolina*, 416 U.S. 653, 661–662, 94 S.Ct. 2023, 2027–2028, 40 L.Ed.2d 443, 450 (1974). The objective of the Taft-Hartley Act was to assure the employer of a loyal and efficient cadre of supervisors and managers independent of the rank and file. That objective is equally applicable to the State, as an employer. *Elk Grove Firefighters Local No. 2340 v. Willis*, 400 F.Supp. 1097, 1101 (N.D.Ill.1975); *Shelofsky, supra,* 32 N.Y.2d at 60, 343 N.Y.S.2d at 102, 295 N.E.2d at 776.

The problems spawned by conflicts of interest when supervisors are also union members and subject to union discipline are poignantly illustrated in our law. A union's constitution and bylaws are the measure of the authority conferred upon the organization to discipline, suspend or expel its members. 48 Am.Jur.2d, Labor and Labor Relations, § 257, p. 195 (1970). Probably the constitution of the International Brother-

hood of Electrical Workers is not atypical in providing a member may be penalized for "working in the interest of any organization or cause which is detrimental to, or opposed to, the IBEW," or "working for any individual or company declared in difficulty with a [local union] or the IBEW." *Florida P. & L. v. Electrical Workers*, 417 U.S. 790, 793, 94 S.Ct. 2737, 2739, 41 L.Ed.2d 477, 481 (1974).

A union may impose fines for "misconduct" affecting the union or any of its members. 48 Am.Jur.2d, Labor and Labor Relations, § 258, p. 196. In *N. L. R. B. v. Local 2150, International Bro. of Elec. Wkrs.*, 486 F.2d 602, 607 (7th Cir. 1973), vac., 418 U.S. 902, 94 S.Ct. 3191, 41 L.Ed.2d 1151 (1974), the seventh circuit enforced an N.L.R.B. order finding the union committed an unfair labor practice in fining supervisors who performed struck work. The circuit court reasoned:

"When the employer has a dispute with the union, and the union disciplines supervisors for performing their supervisory responsibilities on the employer's behalf in that dispute, that discipline 'drive[s] a wedge between [the] supervisor[s] and the Employer' and may reasonably be expected to undermine the loyalty and effectiveness of these supervisors when called upon to act for the company in their representative capacities."

But in a similar case the District of Columbia circuit on an en banc rehearing reached an opposite result with four judges dissenting, holding this type of disciplinary action would not restrain or coerce an employer in selection of representatives for purposes of collective bargaining or adjustment of grievances in violation of 29 U.S. C.A., § 158(b)(1)(B). *International Brotherhood of Elect. Wkrs. v. N. L. R. B.*, 159 U.S.App.D.C. 272, 487 F.2d 1143 (1974). The court perceived it to be important that Congress' 1947 amendments to 14(a) of the N.L.R. Act "solved the conflict of loyalties problem by giving management the right to make the would-be supervisor choose between union loyalty and rank-and-file status on the one hand and management loyal-

ty and supervisory status on the other." *Id.*, 487 F.2d at 1165. By a five-to-four decision, the Supreme Court affirmed. *Florida P. & L. v. Electrical Workers, supra.*

Although the above cases concern strike situations which should not occur in Iowa, § 20.12, The Code, the conflict of loyalties may arise in other circumstances. See, for example, *N. L. R. B. v. Sheet Metal Workers Int. Ass'n., Loc. U. No. 49*, 430 F.2d 1348 (10th Cir. 1970), where a foreman commenced a hoisting operation before regular working hours because the hoist was about to be removed from the jobsite. He was tried and fined by the union on charges he "did perform work prior to the beginning of the regular workday, and used men of other crafts to assist him perform such work, which is within the jurisdictional claims of the sheet metal workers." *Id.*, at 1349.

It is against this backdrop of potential for conflicting loyalties that the status of fire department station commanders should be examined.

The general principles outlined in division II of majority's opinion are found in the cases cited. But those principles and the statutory definition of a "supervisor" are by no means the sole criteria employed to identify supervisors. This is especially true where, as the majority here concedes, the court is confronted by a close case.

A key inquiry is simply to determine who is performing the basic act of supervising. *Ohio Power Co. v. N. L. R. B.*, 176 F.2d 385, 387 (6th Cir. 1949). This concept as applied wells out of the realization that in certain circumstances the person in charge should and must represent management. Typical of decisions applying this criterion are *Vega v. N. L. R. B.*, 341 F.2d 576, 577 (5th Cir. 1965), cert. den., 382 U.S. 862, 86 S.Ct. 123, 15 L.Ed.2d 100 (1965) ("In this case we regard it as of considerable importance that if the petitioners were not supervisors the company's employees were entirely without supervision a large part of the time. (citation) In such circumstances it was not unreasonable to conclude that even the relatively small amount of supervisory power conferred upon and exercised by petitioners

made them representatives of the employer."); *Jas. H. Matthews & Co. v. N. L. R. B.,* 354 F.2d 432, 435 (8th Cir. 1965), cert. den., 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966) ("Finally to be noted is the fact that if the leadmen were not supervisors, Factory Foreman Landis would have to exercise detailed supervision over some thirty-seven employees in the departments involved in a variety of tasks and handling products at many stages of completion in the production process. The unlikelihood of that situation occurring was properly considered by the Board."); *Keener Rubber, Inc. v. N. L. R. B.,* 326 F.2d 968, 970 (6th Cir. 1964), cert. den., 377 U.S. 934, 84 S.Ct. 1337, 12 L.Ed.2d 297 (1964) ("There is evidence * * * that for approximately 75% of the time the second shift was operating Mowen was the only person present in the plant with any authority over a total of ten employees * * *."); *Eastern Greyhound Lines v. N. L. R. B.,* 337 F.2d 84, 87 (6th Cir. 1964) ("In the late night and the early morning hours there are generally no personnel with authority higher than that of a dispatcher on duty. If dispatchers are not supervisors, this multistate transportation system operates a substantial part of the time without supervision.").

In many borderline cases where the character of the employee as a supervisor is not immediately clear when measured against the statutory definition, the N.L.R.B. and courts have looked to various secondary tests or "indicia of authority":

"Among facts which have been regarded as weighing in favor of supervisory status are the following: (1) The employee's designation as a 'foreman' or 'supervisor'; (2) the fact that he is regarded by himself or others as a supervisor; (3) his exercise of privileges accorded only to supervisors; (4) attendance at instruction sessions or meetings held for supervisory personnel; (5) responsibility for a shift or a phase of operations; (6) receipt of orders from management officials rather than from other supervisors; (7) authority to interpret or transmit employer's instructions to other employees; (8) responsibility for inspecting the work of others; (9) instruction of other employees; (10) authority to grant or deny leave of absence to others; (11) responsibility for reporting rules infractions; (12) keeping of time records on other employees; (13) receipt of a weekly or monthly salary rather than hourly production wages; (14) receipt of substantially greater pay than other employees, not based solely on skill; (15) failure to receive overtime pay; (16) lack of requirement to punch time clock; (17) nonparticipation in regular production work; and (18) wearing of different work clothes from other employees."—Labor Relations Expediter, LRX 773 S 411 (The Bureau of National Affairs, Inc., 1975)

Existence of one or a few of the above secondary indicia does not necessarily establish supervisory status; nor does absence of one or a few establish a non-supervisory status. *Id.* But as demonstrated in the next division, the captains and lieutenants whose status is questioned here meet most of these indicia.

Returning to the disjunctively itemized powers in the Iowa Code § 20.4(2) definition of supervisor, the majority correctly articulates the rule the statute does not make *exercise* of one or more of these powers the test of supervisory status. It makes *existence* of one or more of the powers the test. *N. L. R. B. v. Roselon Southern, Inc.,* 382 F.2d 245, 247 (6th Cir. 1967); *N. L. R. B. v. Hamilton Plastic Molding Company,* 312 F.2d 723, 727 (6th Cir. 1963); Annot., 11 A.L.R.2d 249, 250 (1950). An employee may be a supervisor even though he or she has never exercised a power imposed in him or her, *Arizona Public Service Company v. N. L. R. B.,* 453 F.2d 228, 230 (9th Cir. 1971), or where years might pass before any occasion arose calling for exercise of the power, including the power "responsibility to direct" other employees. *N. L. R. B. v. Leland-Gifford Co.,* 200 F.2d 620, 625 (1st Cir. 1952).

It generally is conceded, as majority indicates, the "supervisor" definition in the federal act was intended to cover persons "generally regarded as foremen and persons

of like or higher rank." *N. L. R. B. v. Southern Airways Company,* 290 F.2d 519, 523 (5th Cir. 1961). Although a "straw boss" or "leadman" ordinarily is not a supervisor within the meaning of the act, *Keener Rubber, Inc. v. N. L. R. B., supra,* 326 F.2d at 969, "leadmen" with less power than the officers under scrutiny in this case have been classified as supervisors. *Jas. H. Matthews & Co. v. N. L. R. B., supra,* 354 F.2d at 435; *Trailmobile Division, Pullman Incorporated v. N. L. R. B.,* 379 F.2d 419, 422 (5th Cir. 1967).

Because majority concurs in the hearing examiner's conclusion these company commanders are "leadmen" or "straw bosses" and are therefore not supervisors excluded from the bargaining unit, those terms should be further examined.

In early logging days under certain conditions straw was spread on mountainous slopes too steep for horses to hold back a sled load of logs. The person who redistributed the straw with a pitchfork before the next load gave the word when the slope was prepared. The teamsters who had greater responsibilities were not to proceed until so signalled. Hence the term "straw boss." *N. L. R. B. v. Swift and Company,* 292 F.2d 561, 563, n. 2 (1st Cir. 1961). "Perhaps a modern counterpart would be an attendant at a company parking lot with authority to direct higher-ups in the organization with respect to parking their cars." *Id.*

Roberts' Dictionary of Industrial Relations, p. 407 (1966), defines "straw boss" as "[a] gang or group leader, a worker who takes the lead in a group which consists of himself and a small number of other employees. He performs all of the duties of the other workers and his supervisory activities are incidental to his production performance."

"Leadman" is a "term applied usually to the individual who sets the pace for a group or a team working on a particular operation." *Roberts', supra,* p. 219. A related word is "leaders," a term "occasionally * * * applied to individuals who are hired to establish performance standards and individuals unions claim are 'speeders' used by employers to increase the rate at which average workers are required to perform." *Roberts', supra,* p. 218.

The distinguishing characteristic which definitionally links both "straw men" and "leadmen" is their duty to perform the same work being done by their fellow employees, only better. The exception is the parking lot "straw boss" whose overall responsibility and duties are ordinarily less than the persons he directs within the sphere of his very limited jurisdiction.

A "foreman" on the other hand is "[g]enerally the first line of management in the operation of the plant or facility. The individual who, in the eyes of the production worker, represents management and authority. He is generally the immediate supervisor of a group of workers and has the responsibility to recommend suspension, discharge or promotion. He also has the direct responsibility for seeing to it that the work is performed and the production schedule met. He carries out management policy on the operating level and acts as an intermediary between workers and middle management." *Roberts', supra,* p. 114.

In the context of a military or paramilitary organization foremen have been equated with noncommissioned sergeants:

"Foremen are officers of management, but of a special kind; like noncommissioned sergeants, they bear a special relationship to the employee troops, one that promotes two-way communication and working relationships, and is of unique value to the entire enterprise."—*International Brotherhood of Elec. Wkrs. v. N. L. R. B., supra,* 159 U.S.App.D.C. at 300, 487 F.2d at 1171 (Leventhal, Circuit Judge, concurring)

In the public employment sector, a person clearly operating in a supervisory capacity will seldom if ever be found to have all the powers itemized in § 20.4, The Code. Most state employees have statutory protection in selection, tenure, discipline, and termination. Chapter 19A, The Code. Merit commission rules may become applicable. See,

for example, Rule 570–15.3, IAC 7/1/75, Ch. 15, p. 1:

"Step 1. The classified employee shall initiate the grievance or complaint by orally bringing it to the attention of his immediate supervisor for oral discussion within five days of the incidence of the alleged grievance or complaint. The immediate supervisor shall within five working days orally transmit his decision to the employee."

Other civil service enactments afford protection to employees of police and fire departments. Chapter 400, The Code. Similar statutory provisions protect other public employees. Even a school board may encounter almost insurmountable difficulties in terminating a teacher. *Keith v. Community School Dist. of Wilton, Etc.,* 262 N.W.2d 249 (Iowa, 1978).

The federal definition of supervisor, 29 U.S.C.A., § 152(11), never was intended to apply to a public employee. It is tied to "employer," which does not include "any State or political subdivision thereof." 29 U.S.C.A., § 152(2). The Iowa legislature, carrying this definition (§ 20.4, The Code) into the area of public employment where traditional supervisory functions already were curtailed could not have intended its criteria to be so rigidly or strictly applied as in private-sector situations. At the same time, there is no reason to assume the legislature intended to eliminate supervisors, however much their traditional authority is circumscribed statutorily.

The legislature's intent is manifest further by the statutory identification of "assistant principal" as a supervisor. § 20.4, The Code. Clearly the duties of that office may be as "routine" as those of a fire department station commander.

III. *Merits of hearing officer's decision.*

An overview of the hearing officer's decision which became the initial holding in this case discloses it results from two basic errors. The first relates to a failure to allow for characteristics of paramilitary organization; the second arises from failure to consider important evidence.

The safety of persons and property is at the core of the State's police power. *Kelley v. Johnson,* 425 U.S. 238, 247, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708, 715 (1976). The paramilitary structures selected to provide fire and police protection necessarily give weight to the overall need for discipline, esprit de corps, and uniformity. *Id.,* 425 U.S. at 248, 96 S.Ct. at 1446, 47 L.Ed.2d at 716; *Quinn v. Muscare,* 425 U.S. 560, 562, 96 S.Ct. 1752, 1753, 48 L.Ed.2d 165, 168 (1976); *Elk Grove Firefighters Local No. 2340 v. Willis, supra,* 400 F.Supp. at 1100 ("Clearly, an efficient fire department is a legitimate and substantial state interest. \* \* \* [T]he efficiency of public employees generally is a legitimate and substantial governmental interest. This interest is particularly strong with respect to firefighters because of the need for them to act quickly and effectively to prevent grievous loss of life and property.").

As in any military organization, fire department operational procedures are, so far as possible, written and standardized for the above purposes. But because these procedures are so vital, obviously it is necessary supervisory personnel be on hand with § 20.4 "responsibility to direct" the rank and file in carrying them out. When lives hang in balance, equipment and personnel must function. An unsupervised malingering fireman may fail in an essential hose hookup. A depleted battery may make the difference between a "routine" fire call and a holocaust.

To be "responsible" in the § 20.4 context "is to be answerable for the discharge of a duty or obligation. Responsibility includes judgment, skill, ability, capacity, and integrity, and is implied by power." *Ohio Power Co. v. N. L. R. B., supra,* 176 F.2d at 387, quoted in *N. L. R. B. v. Fullerton Publishing Company,* 283 F.2d 545, 549 (9th Cir. 1960). Each station commander is charged with implementing fire department policy for a separate shift in a separate location. He has direct control of a number of persons. He is charged with responsibility for valuable property and equipment—$2,473,-000 worth at station number one, $700,000 each at the other stations.

Of course to be classified as supervisors the statute requires these officers use "independent judgment." But the judgment required to supervise and motivate rank-and-file paramilitary personnel clearly would qualify as "independent judgment," as would the judgment required in those situations where written procedures fail to fit. It is a matter of common knowledge our armed forces have detailed written war plans for every foreseeable contingency. But no one would contend military line officers therefore are not supervisors, or lack "responsibility to direct" using "independent judgment."

The intervenor union attempted to denigrate the station commander's functions by stressing the nitty-gritty indicia of all military life, including orders relating to "housework" details. Much was made of the right of lower-ranked persons to file complaint against a station commander in an effort to detract from the officer's right to press charges against those under his control. This right of the rank and file is an ordinary incident of military structure. See Index and Legislature History, Uniform Code of Military Justice, Art. 138, p. 594 (U.S. Print. Off. 1950). Such efforts ignore another vital facet of military structure—the judgment, skill, ability and integrity required of an officer charged with directing personnel in performing the organization's ultimate function. The only *raison d'etre* for fire fighters is to fight fires.

The second overview impression of the hearing officer's decision relates to his obvious failure to consider all the evidence. The city-employer offered testimony of the fire chief, assistant fire chief, city manager, two district chiefs, four captains and a lieutenant. The intervenor union presented testimony of two captains, three lieutenants and three engineers. The management-union conflict-of-interest which, in the fire chief's words, "tears an officer both ways," was starkly apparent.

Employer's witnesses furnished more than adequate testimony to prove the station commanders—captains and lieutenants—met the § 20.4 requirements to establish their supervisory status. Intervenor's witnesses sought to show the company commanders' duties were inflexibly dictated by written orders and procedures, they exercised no independent judgment, and did not supervise. The concept sought to be projected was that all fires are routine, present no unanticipated or unique characteristics and are controlled (and lives and property saved) by mechanistic application of set procedures. Of course this requires the fact finder and reviewing court to abandon all common knowledge concerning such disasters.

But a more significant factor emerged. Before the Public Employment Relations Act (Ch. 20, The Code) was enacted all of the captains and lieutenants who testified for intervenor separately had prepared and certified to descriptions of their duties, for a different purpose. These statements were diametrically opposed to their hearing testimony concerning their duties and responsibilities.

One lieutenant typically wrote:

"I am responsible for directing men in rescue operations necessary and placement of ladders or other equipment necessary for this operation. I must do whatever needed to gain entrance to building, locate seat of fire, ascertaining materials involved, dangers involved with said material and type of structure involved. I must direct laying of hose lines to the seat of the fire, bearing in mind protection of property, exposure of adjacent property, safety of the men in my crew and others on the fire ground. * * * It is possible I would be in charge of activities at fire for five minutes before arrival of District Chief and longer if for some reason he is delayed. After arrival of superior officer I am still responsible for the safety and actions of my crew and others placed in my command. I must direct firefighting activities assigned me at which time I must use my own judgment as supervision will be only periodic. * * *

"I must train or direct the training of company personnel daily. * * *

"I must direct the inspection of all commercial occupancies in my assigned territory. * * * We must be able to sell ourselves and our ideas to those we are trying to help or correct. This end we must achieve for the safety of those involved, our own men, and in an attempt to reduce overall fire loss.

"I must direct my company in the inspection of homes in our assigned territory. * * *

"I must supervise and assist the daily checks of all equipment to assure its readiness to respond. I am responsible for the condition of all equipment assigned to the company. * * *

"It is my responsibility to see that all personnel in my company are familiar with and follow all Rules and Regulations set down by the Chief of the Des Moines Fire Department. * * *"

Intervenor's witnesses admitted writing and certifying to the statements, which are in the record. But nowhere in the hearing officer's decision does he mention or otherwise come to grips with this important evidence. If a review requires consideration of "the body of evidence opposed to the Board's view," see division I, *supra*, the initial fact finder ought to make some indication he or she has considered substantial evidence opposed to his or her view. On review of the decision of a deputy industrial commission we have said "[h]is decision must be sufficiently detailed to show the path he has taken through conflicting evidence." *Catalfo v. Firestone Tire and Rubber Co.*, 213 N.W.2d 506, 510 (Iowa 1973). See *Sondag v. Ferris Hardware*, 220 N.W.2d 903, 907–908 (Iowa 1974). A comparable duty should be imposed in this instance.

The only logical inference is the hearing examiner failed to consider a body of evidence which essentially demolished the only testimony he could have relied on in arriving at his fact-findings.

One other general observation should be made. These officers and lieutenants are not "leadmen" or "straw bosses," terms explored in division II, *supra*. When promoted, these officers obtain new insignia and wear a white shirt. The record is undisputed they then are not required to do the work of the persons they command. So they are not leadmen or straw bosses. Their duties and responsibilities are not less than those they direct, nor is their jurisdiction circumscribed to a narrow area, so they are not "parking lot" straw bosses. Intervenor's witness, a lieutenant responding to a question designed to discover why he was needed at the station if he neither worked nor supervised, responded, "Well, somebody has to be a leader, sir. I mean, somebody has to be there to call the plays."

Reviewing the hearing officer's decision by considering the record as a whole, including the body of evidence opposed to his view, should result in affirmance of trial court's reversing decision. These officers met several of the § 20.4 criteria.

(1) *Responsibility to direct other public employees.*

The testimony of the city's witnesses, coupled with admissions of intervenor's witnesses and impact of their certified written statements, overwhelmingly demonstrates these commanders possessed the above power. On the fire ground, such an officer has complete control in the critical first minutes before the district chief's arrival. Thereafter, he might well be assigned to control his men and equipment in a given area. One of the intervenor's captain witnesses testified on cross-examination:

"Q. Now, even after the arrival of the district chief, do you agree with Captain Phillips that an area would be assigned then by the district chief to a particular captain, for example? A. It could very well be.

"Q. For example, he would be responsible for a roof or the back of a building, or a floor, the second floor? A. Yes.

"Q. And he and his men would be in that particular area then? A. Right."

No one really disputed the officers in charge had responsibility to direct the rank and file in care and inspection of buildings and equipment.

The responsibility of these first-level supervisors is capsulated in the assistant fire chief's testimony, "We have 10 fire stations, and if we do not have company officers enforcing our rules and regulations, we would have 10 different fire departments in the City of Des Moines, and this would create chaos on a fire scene, so that's why I believe that the company officers are key personnel."

(2) *Authority to assign other public employees.*

The hearing officer found station commanders "may assign those house duties to the men in any manner * * * ." This is the finding of *existence* of the power, regardless of its *exercise*. The federal cases interpreting the statutory language require no more.

In addition, there is little dispute in the record such an officer has power to assign in the following areas:

(a) to assign a person to conduct drill or instruction,

(b) to periodically rotate new recruits "for experience from the engine company to the ladder company for training purposes,"

(c) to assign and designate the personnel who will be temporarily transferred out of the station when call is made for help at some other location,

(d) to assign persons to various pieces of equipment under his command, and

(e) to assign personnel to attack unit work, without regard for seniority.

(3) *Authority to effectively recommend promotion of other public employees.*

The hearing officer's decision recognizes these officers are required to make detailed evaluation reports on persons under their command for purposes of permanent status, promotion and step raises. He notes and apparently believes the fire chief's testimony the latter relies on these reports and separately-prepared reports of the district chief. But he rejects the officers' probation and step pay recommendation functions as meeting § 20.4 requirements on the sole

ground that if the station commander's recommendation was inconsistent with the district chief's separate recommendation, the chief would conduct an investigation before taking action.

And the hearing officer rejected the commanding officers' promotion recommendation function on the sole ground promotions are subject to civil service laws and the company officers' ratings "determine not more than 10 percent of an employee's total score."

We are not confronted here with a factual dispute. We are confronted with the hearing examiner's construction of § 20.4, The Code, for he is determining, as a matter of law, what will meet its requirements.

We have recognized we should give weight to administrative interpretations of statutes, particularly when they are of long standing. *Iowa Nat. Indus. Loan Co. v. Iowa State Dept. of Revenue*, 224 N.W.2d 437, 440 (Iowa 1974). However, the meaning of a statute is always a matter of law, and the final construction and interpretation of Iowa statutory law is for this court. *Cassady v. Wheeler*, 224 N.W.2d 649, 651 (Iowa 1974); *Hubbard v. State*, 163 N.W.2d 904, 909 (Iowa 1969).

Assuming in this split-decision situation the hearing officer's analysis of § 20.4 requirements may be regarded as an administrative interpretation, it is not of long standing. Nor does it conform to federal court interpretations of the same provisions found in 29 U.S.C.A., § 152(11). In *N. L. R. B. v. Metropolitan Life Insurance Company*, 405 F.2d 1169, 1177 (2d Cir. 1968), unlike the case before us, there was direct review of promotion recommendations by immediate supervisors, yet the court ruled:

"These reports so submitted by the watch engineers and the assistant air conditioning engineers were received by their immediate supervisors. If the watch engineers' or the assistant air conditioning engineers' immediate supervisors disagreed with the evaluations they could note the basis of their disagreement on the back of the form. This power to

review held by the immediate supervisors of the engineers whose status is at issue does not demonstrate that the latter are not 'supervisors' under the Section 2(11) definition. The power to recommend promotion is, of course, not the power actually to promote and consequently promotion recommendations will always be subject to review by those who, in fact, have the final power to promote."

Examples in the record disclose the company commander's recommendations were effectual a good portion of the time. This is all that is required. *N. L. R. B. v. Southern Airways Company, supra,* 290 F.2d at 524. In a civil service setting a recommendation is effective if (1) made on behalf of management, (2) based on the independent judgment of the alleged supervisor, and (3) the recommendation either by itself or in conjunction with other recommendations *could* result in action. United States Naval Weapons Center, China Lake, Calif., FLRC No. 72A–11, GERR RF–117 (1973).

Nor should this court construe § 20.4 to mean a recommendation which will weigh ten percent of an employee's promotion score does not meet the "effective" recommendation requirement of that statute. Frequently such an edge is determinative in a pool of persons qualified for promotion, as illustrated by litigation arising from veteran's preference laws. See *Feinerman v. Jones,* 356 F.Supp. 252, 256 (M.D.Pa.1973) (ten points); *Koelfgen v. Jackson,* 355 F.Supp. 243, 246 (D.Minn.1972), aff'd., 410 U.S. 976, 93 S.Ct. 1502, 36 L.Ed.2d 173 (1973) (five points); cf. *Zanfes v. Olson,* 232 Iowa 1169, 7 N.W.2d 901 (1943).

The hearing examiner's interpretation of § 20.4 was wrong. On this point alone the district court's reversing opinion should be affirmed.

### (4) *Authority to adjust grievances.*

The hearing officer's conclusion these station commanders had no authority to adjust grievances proceeds from a faulty premise in a classical example of circular reasoning:

"Since the authority of company commanders is limited to routine and clerical matters, and absent any additional power in the company officers to take special action based on employee grievances, I find that the authority to company officers to adjust grievances relates only to routine and clerical matters and does not require the use of independent judgment."

There is no dispute the city ordinance provides the first step of fire department grievance procedure is the immediate supervisor of the grieved employee, or that employers brought their "gripes" to the station commander for their resolution. The hearing examiner so found.

But, as noted by trial court, the decision set forth no basic facts to justify its conclusion the "gripes" were "routine and clerical" in subject matter.

In the *Davenport* case, the PER Board adopted the Roberts' Dictionary of Industrial Relations definition of the statutory term "grievance," meaning "[a]ny complaint by an employee \* \* \* concerning any aspect of the employment relationship." *Id.,* at 128.

This record contains examples of disputes about alleged inequitable work assignments, the propriety of temporary work assignments, and similar "gripes." It is plain these fall within the PER Board's "grievance" definition—a complaint concerning an aspect of the employment relationship. These grievances are within the power of the company commanders to resolve. The testimony is clear the officers are expected to, and do, resolve them. Thus they meet the § 20.4 requirement to be classified as supervisors.

### (5) *The authority to discipline.*

The hearing officer found company officers "do have some authority" in the area of discipline. But he determined this did not meet the § 20.4 requirement because the power allegedly was limited to oral warnings. Of course this ignores the officers' weapon of evaluation reports for retention of probationary personnel, step pay increases and promotion. The first two

forms pose 15 questions calling for the officer's judgment of the employee and his or her work. The promotion form poses 23 such questions. These questions include such queries as "Acceptance of authority or orders?", "Disposition and personal conduct?" and "Record specific work performance deficiencies or job behavior requiring improvement or correction."

The officer can press charges if the ordinary measures are insufficient—clearly an effective recommendation of discipline, which is all the statute requires. See *N. L. R. B. v. Roselon Southern Inc., supra,* 382 F.2d at 247 ("As a result of her own judgment, she could issue warning slips, she had the authority to discipline any of her workers, and in fact reported one operator for disciplinary action. This was certainly supervisory conduct within the meaning of the act.").

Trial court found "as a matter of law company officers possess and exercise the statutory criteria of 'authority to discipline,' and that such involves independent judgment." It is a finding which should be adopted here.

Finally, these company commanders should be examined in light of the 18 secondary tests identified in division II, *supra:*

(1) *Designation as "foreman" or "supervisor."* These persons carry the higher and more prestigious designation of captain and lieutenant.

(2) *Regarded by himself or others as a supervisor.* Exhibit 34, incorporating the duty descriptions prepared by these officers (including intervenor's witnesses) proves this point.

(3) *Exercise of privileges accorded only supervisors.* These officers are not required to do "housework," have a separate office in the· newer stations, have other privileges indicated below.

(4) *Attendance at instruction sessions held for supervisory personnel.* Most of these officers have attended lengthy courses designed for supervisors at various colleges and universities, with department approval.

(5) *Responsibility for shift or a phase of operations.* Clearly met.

(6) *Receipt of orders from management officials rather than from other supervisors.* This is not disputed.

(7) *Authority to interpret or transmit employer's instructions to other employees.* Undisputed on the fire ground.

(8) *Responsibility for inspecting the work of others.* Undisputed.

(9) *Instruction of other employees.* Conceded.

(10) *Authority to grant or deny leave of absence to others.* Qualify only to the extent of supervising "the picking of vacations by seniority, checks to see if each man picks the right amount of vacation time and holiday time, prepares vacation report sheets to be checked by District Chief."

(11) *Responsibility for reporting rules violations.* Unquestioned.

(12) *Keeping of time records on other employees.* Officers must promptly report absence of any men.

(13) *Receipt of a weekly or monthly salary rather than hourly production wages.* Probably not applicable in a public employment situation.

(14) *Receipt of substantially greater pay than other employees.* There are substantial pay differences between officers and rank-and-file department employees.

(15) *Failure to receive overtime pay.* Facts not disclosed by the record.

(16) *Lack of requirement to punch time clock.* Probably no time clock, but officers must be punctual.

(17) *Nonparticipation in regular production work.* These officers are not required to perform station duties and most of them do not. They supervise this work.

(18) *Wearing of different work clothes from other employees.* Undisputed.

These company commanders meet approximately 15 of the 18 secondary tests to determine supervisory status. In a close case, this should be determinative. Labor Relations Expediter, *supra.*

More cases involving such officers support the district court determination below rather than the hearing officer's decision. See *Elk Grove Firefighters Local No. 2340 v. Willis, supra,* 400 F.Supp. 1097; *City of Grand Island v. American Fed. of S. C. & M. Empl.,* 186 Neb. 711, 185 N.W.2d 860 (1971) (involving the precise question before us. That the Nebraska union was successful later in securing a legislative amendment should not influence our decision—intervenor has available the same remedy); Basic Management, Inc., 104 N.L.R.B. No. 133, 32 LRRM 1191 (1953) ("fire captain and two lieutenants [at basic magnesium plant] are excluded * * * in view of their responsibility to direct the performance of firemen"); Hawthorne School of Aeronautics, 104 N.L.R.B. No. 150, 32 LRRM 1212 (1953); Hawaii Fire Fighters Ass'n., Hawaii P.E.R.B. No. 437 (1972); Mare Island Naval Shipyard, Vallejo, Calif., FLRC No. 72A–12, GERR ___ (1973); United States Naval Weapons Center, China Lake, Calif., *supra.*

The hearing officer's decision was based on errors of law which are raised by the employer. It cannot be supported upon a review of the entire record including the body of evidence opposed to his findings.

I would affirm district court's determination.

LeGRAND and REES, JJ., join in this dissent.